Nebraska Supreme Court Online Library
www.nebraska.gov/courts/epub/
03/18/2016 09:18 AM CDT

IN RE INTEREST OF ISABEL P. ET AL.,
CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLANT, AND BRADLEY C. EASLAND,
GUARDIAN AD LITEM, APPELLEE AND CROSS-APPELLANT,
V. CHARLES J., APPELLEE AND CROSS-APPELLEE.
___ N.W.2d ___

Filed March 18, 2016.    No. S-15-487.

1. **Statutes: Appeal and Error.** Statutory interpretation is a question of law that an appellate court resolves independently of the trial court.
2. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings.
3. **Jurisdiction: Appeal and Error.** Before reaching the legal issues presented for review, it is the power and duty of an appellate court to determine whether it has jurisdiction over the matter before it, irrespective of whether the issue is raised by the parties.
4. **Jurisdiction: Final Orders: Appeal and Error.** For an appellate court to acquire jurisdiction of an appeal, there must be a final order entered by the court from which the appeal is taken.
5. **Final Orders: Appeal and Error.** A substantial right is affected if an order affects the subject matter of the litigation, such as diminishing a claim or defense that was available to the appellant prior to the order from which the appeal is taken.
6. **Juvenile Courts: Parental Rights: Due Process.** So long as a parent was afforded due process of law, a defect during the adjudication phase does not preclude consideration of termination of parental rights pursuant to Neb. Rev. Stat. § 43-292(1) through (5) (Cum. Supp. 2014).
7. **Parental Rights: Proof.** In order to terminate parental rights, a court must find by clear and convincing evidence that one of the statutory grounds enumerated in Neb. Rev. Stat. § 43-292 (Cum. Supp. 2014) exists and that the termination is in the child's best interests.

8. **Parental Rights: Abandonment: Words and Phrases.** For purposes of Neb. Rev. Stat. § 43-292(1) (Cum. Supp. 2014), "abandonment" is a parent's intentionally withholding from a child, without just cause or excuse, the parent's presence, care, love, protection, maintenance, and the opportunity for the display of parental affection for the child.

9. **Parental Rights: Abandonment: Proof.** To prove abandonment in determining whether parental rights should be terminated, the evidence must clearly and convincingly show that the parent has acted toward the child in a manner evidencing a settled purpose to be rid of all parental obligations and to forgo all parental rights, together with a complete repudiation of parenthood and an abandonment of parental rights and responsibilities.

10. **Parental Rights: Abandonment: Time: Intent.** A court reviewing a termination of parental rights case on the ground of abandonment need not consider the 6-month period in a vacuum. Instead, the court may consider evidence of a parent's conduct, either before or after the statutory period, in determining whether the purpose and intent of that parent was to abandon his or her children.

11. **Parental Rights: Abandonment.** Abandonment is not an ambulatory thing the legal effects of which a parent may dissipate at will by token efforts at reclaiming a discarded child.

12. **Parent and Child.** Parental obligation requires a continuing interest in the child and a genuine effort to maintain communication and association with that child.

13. **Parental Rights: Presumptions: Proof.** A child's best interests are presumed to be served by having a relationship with his or her parent. This presumption is overcome only when the State has proved that the parent is unfit.

14. **Constitutional Law: Parental Rights: Words and Phrases.** In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being.

15. **Parental Rights.** The best interests analysis and the parental fitness analysis are fact-intensive inquiries. And while both are separate inquiries, each examines essentially the same underlying facts as the other.

Appeal from the County Court for Madison County: Ross A. Stoffer, Judge. Reversed and remanded with directions.

Gail E. Collins, Deputy Madison County Attorney, for appellant.

Kathleen Koenig Rockey, of Copple, Rockey, McKeever & Schlecht, P.C., L.L.O., for appellee Charles J.

Bradley C. Easland, of Morland, Easland & Lohrberg, P.C., guardian ad litem.

Wright, Connolly, Miller-Lerman, Cassel, and Stacy, JJ.

Wright, J.

## I. NATURE OF CASE

The State appeals an order of the county court for Madison County, Nebraska, sitting as a juvenile court, declining to terminate Charles J.'s parental rights to his son, K.J., pursuant to Neb. Rev. Stat. § 43-292 (Cum. Supp. 2014). The juvenile court declined to terminate parental rights, because it had not provided counsel for Charles in the proceedings leading up to the adjudication of K.J. pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008). The State appeals, and the guardian ad litem (GAL) cross-appeals.

## II. BACKGROUND

In 2012, K.J. and his three siblings were living with their mother, Kristie P., in her mother's apartment in Norfolk, Nebraska. Kristie had recently been cited for child abuse and was struggling with addiction. Her mother called the Department of Health and Human Services (DHHS) out of concern for her grandchildren. Several other calls were made to DHHS as well. On October 18, DHHS removed the children from the apartment. K.J. and one of his brothers were placed in a foster home together and remained there at the time of the hearing on the State's petition to terminate Charles' parental rights.

### 1. Adjudication

On October 19, 2012, the State filed a petition pursuant to § 43-247(3)(a), which grants courts jurisdiction over any person under the age of 18

who lacks proper parental care by reason of the fault or habits of his or her parent . . . ; whose parent . . . neglects or refuses to provide proper or necessary subsistence, education, or other care necessary for the health, morals, or well-being of such juvenile; . . . or who is in a situation . . . dangerous to life or limb or injurious to the health or morals of such juvenile.

A child adjudicated to be within the meaning of § 43-247(3)(a), and thus under the court's jurisdiction, is said to be "adjudicated."[1]

The State requested that the court adjudicate the four children, including K.J., and enter orders of disposition in the best interests of the children. The petition alleged, among other things, that the mother of the children, Kristie, was physically and/or verbally abusive to the juveniles, had failed to give K.J. or his school officials his prescribed psychiatric medicines, and was transient and left her children with others without telling them how long she would be gone or where she could be reached.

The first hearing for the adjudication petition took place on November 1, 2012. Although there were no allegations against him, Charles appeared at the hearing. The State indicated that it was under the impression that Charles was not very involved in K.J.'s life and suggested that a supplemental petition might be filed to include allegations against Charles.

At the hearing, the court advised both Charles and Kristie of the nature of the proceedings, the possible consequences, and the parties' rights, as required by Neb. Rev. Stat. § 43-279.01 (Reissue 2008). Those rights include the right of a parent to have counsel appointed if the parent is unable to afford to hire a lawyer. Kristie requested and was appointed an attorney. The

---

[1] See, *In re Interest of Joshua M. et al.*, 256 Neb. 596, 591 N.W.2d 557 (1999); *In re Interest of Keisha G.*, 21 Neb. App. 472, 840 N.W.2d 562 (2013).

court declined to appoint an attorney for Charles because there were no allegations against him. It stated:

> Once allegations are filed against you, or in other words, once the State starts saying some things that you did that also caused the children to be put in that position that I talked about before where they were endangered or abandoned or abused or anything of that nature, then, at that point, you would become entitled to have an attorney here and I would address that with you at that time.

The State requested that the care, custody, and control of the children remain with DHHS. Charles objected to the request, explaining that he would like to have custody of K.J. At that time, Kristie supported placement of K.J. with Charles. But the State did not, and it presented evidence against Charles. Because of the evidence adduced about Charles' criminal history, his history of drug abuse, and his failure to provide DHHS with information that would allow them to do a background check on Charles' roommates, the court ordered care, custody, and control to remain with DHHS.

Kristie eventually admitted most of the allegations within the adjudication petition and relinquished her parental rights to the children, including K.J.

## 2. Petition to Terminate Charles' Parental Rights

Over 22 months after the adjudication, on August 27, 2014, the State petitioned to terminate Charles' parental rights. Section 43-292 allows for termination of parental rights if the termination is in the best interests of the child and at least one of the enumerated grounds within the statute exists. The State alleged that grounds (1) through (3), (6), and (7) existed. Section 43-292 provides, in relevant part:

> The court may terminate all parental rights between the parents . . . and such juvenile when the court finds such action to be in the best interests of the juvenile and it

appears by the evidence that one or more of the following conditions exist:

(1) The parents have abandoned the juvenile for six months or more immediately prior to the filing of the petition;

(2) The parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection; [and]

(3) The parents, being financially able, have willfully neglected to provide the juvenile with the necessary subsistence, education, or other care necessary for his or her health, morals, or welfare or have neglected to pay for such subsistence, education, or other care when legal custody of the juvenile is lodged with others and such payment ordered by the court.

Charles was appointed counsel on October 15, 2014. On October 28, at the first hearing on the petition to terminate, the court again informed Charles of the nature of the proceedings, the possible consequences, and his rights, as required by § 43-279.01.

### 3. Charles' Objection
#### to Case Plan

On November 5, 2014, Charles filed an objection to the case plan, which contained the goal of adoption for K.J. Charles opposed that goal and also requested that the case plan set forth a more specific schedule of visitation.

A hearing on Charles' objection to the case plan was held on January 29, 2015. The DHHS worker who created the case plan testified that visitations were always the parents' responsibility to schedule. Initially, Charles was able to schedule a visit with K.J. for up to 15 hours per week, but was subsequently limited to therapeutic visits, because he had missed a number of scheduled visits and the visits were negatively affecting K.J. The foster mother testified as to K.J.'s behavior before and

after visits with Charles and stated that K.J. told her he did not want visits with Charles.

The juvenile court overruled Charles' objection to the case plan and found it was in K.J.'s best interests that no visitation take place at that time. The court's order stated, "Clear and convincing evidence [was] presented that during a period of over 6 months beginning February 20, 2014, no contact took place between [Charles] and [K.J.]"

### 4. Hearing on Motion to Terminate Charles' Parental Rights

The hearing on the motion to terminate Charles' parental rights was held on February 24 and 27 and March 27, 2015. At the termination hearing, evidence was presented concerning (a) Charles' relationship with K.J. from birth to removal; (b) DHHS' consideration of placing K.J. with Charles after removal; (c) K.J.'s experience in foster care; and (d) Charles' relationship with K.J. while K.J. was in foster care, including the frequency and length of Charles' visits.

### (a) Charles' Relationship With K.J. From Birth to Removal

When K.J. was conceived, Charles and Kristie were not married and both testified that they were not in a romantic relationship at the time K.J. was born. Charles testified that during the first month of K.J.'s life, he was living with Kristie and helped her with K.J. and her other children.

In 2005, when K.J. was 1-month old, Kristie and Charles were involved in a domestic violence disturbance. An investigator from the Norfolk Police Department, who had responded to the call, testified that an eyewitness said Charles hit Kristie in the face and body while she was holding K.J. Charles was convicted of third degree assault and sentenced to 20 days in jail. Kristie testified she did not have much contact with Charles after that time.

After Charles served the sentence for that assault, he was transferred to South Dakota to serve a 4-year sentence for

possession with intent to distribute cocaine. Charles also served time for tampering with a witness. He was granted parole in 2006.

Kristie testified that while Charles was in jail, he did not send any cards, letters, or gifts to K.J. Even when Charles was not serving time, Kristie said that Charles did not send cards or letters to K.J. and that he never came to K.J.'s birthdays. However, Kristie testified that Charles did give K.J. a few gifts.

When Kristie was in jail, Kristie's mother had temporary guardianship of K.J. She allowed Charles, who was on parole at the time, to see K.J. as much as he wanted, until she received a call from DHHS inquiring about where K.J. was living. According to Kristie's mother, Charles had gone to DHHS to get benefits for K.J. by saying K.J. lived with him. Charles' parole was revoked in 2007 after he was convicted of driving under the influence. He was released later that year.

Kristie testified that when Charles was not in jail and before K.J. was removed, Charles would visit about four times a year. In 2009, when K.J. was 4 years old, Kristie and her children lived in Burlington, Iowa. She agreed to meet Charles in Des Moines, Iowa, so that he could take K.J. back to Norfolk for a few days. After Kristie had driven 4 hours back to Burlington, she received a call from the Norfolk Police Department notifying her that they had found her 4-year-old son wandering the street alone in the middle of the night. Kristie immediately called her mother, who lived in Norfolk, and asked her to go to the police station and get K.J.

In 2012, when K.J. was 7 years old, Kristie sent K.J. to stay with Charles in Lincoln, Nebraska. Charles' "neighbor," Willie M., who lived in the basement of the house Charles rented, called Kristie and told her that Charles had left K.J. with him. Willie is a convicted felon and admitted that he was charged with strangulation and child abuse, which later was reduced to a third degree assault. He also testified that he has been

convicted of assault and delivery of an exceptionally hazardous drug, a Class II felony.

Another time in 2012, Charles left K.J. in Lincoln for 6 to 7 days while Charles went to Texas to visit a girlfriend. Kristie said Willie contacted her again, and she and her mother drove to Lincoln to get K.J.

The testimony conflicted as to the length of time Charles was in Texas and the extent of supervision K.J. received while Charles was gone. Kristie's mother testified that K.J. was very upset when she and Kristie arrived and told her that he was scared because he had awakened in the middle of the night and that Charles was gone and the door to the basement where Willie lived was locked. K.J.'s DHHS worker testified that Charles told her that he had a neighbor "checking in" on K.J.

Willie testified he was responsible for K.J. while Charles was in Texas. Willie testified that K.J. stayed with him every night and was with him all waking hours. He said this was possible because he does not work on the weekends. When confronted with evidence that Charles was gone for more than a weekend, Willie said, "Well, I'm not — I don't — I don't recall that, you know. But . . . you know, you got other people there, too, you know what I mean."

Charles also testified about the Texas incident. After being confronted with prior testimony from the first adjudication hearing, Charles admitted he was in Texas for 6 or 7 days. He said he made arrangements for K.J. before he left. He told Kristie, Willie, and another neighbor that he was going to see his girlfriend and his cousin and would be gone for 2 or 3 days. Charles said he made sure that there was food, that K.J. had clothes, and that the neighbors would help watch K.J. His return was delayed because he was flying with a "buddy pass," which he explained only allowed him to fly standby. He said that during the 2 or 3 extra days he was gone, the other neighbor watched K.J. while Willie was at work. The other neighbor was not at the hearing and did not testify.

In contrast to Kristie's testimony that Charles visited K.J. only about four times per year, Charles testified that he saw K.J. at least two times per week between 2007, when he was released from prison, until 2010, when he went back to prison for conspiracy to commit a Class II felony. Charles testified that he spent holidays with K.J., but he could not specify which holidays or which years. He then testified that he remembered spending Thanksgiving of 2013 with K.J. His counsel promptly reminded him that was not possible, because K.J. was removed from his home in October 2012. Charles then said it must have been the year before (2012). When his counsel suggested it was 2011, Charles agreed.

There was never a custody agreement or custody order regarding K.J., but Charles was ordered to pay $50 per month for K.J. At the time of the termination hearing, Charles was $2,320 in arrears with regard to K.J. Charles has four other children for whom he is obligated to pay child support, and he was behind on all those obligations at the time of the termination hearing.

### (b) Placement of K.J.
### With Charles

A child protection safety worker from DHHS testified that she was involved with the investigation and removal of K.J. and his siblings from their home. After K.J. was removed, she interviewed K.J. regarding his relationship with Charles. She said it did not appear that Charles was very involved with K.J.

The worker contacted Charles as a potential placement for K.J., but several things caused her concern. Charles had a history of drug and alcohol use and had been convicted of several drug-related crimes. Charles was convicted of attempted possession of cocaine, driving while under the influence, and possession of marijuana. The worker was also concerned because K.J. told the worker that Charles had a lot of beer cans in his apartment.

Charles' propensity for violence was another concern. Kristie had told the worker that Charles had assaulted her just after K.J. was born. And at the termination hearing, Charles admitted that he had served 30 days for an assault of a different woman.

The worker was also concerned about placing K.J. with Charles because of the Texas incident. She noted that K.J. expressed a fear of being left alone that was not isolated to the Texas incident. She testified that regardless of these concerns, she could not place K.J. with Charles, because DHHS requires that background checks be performed on everyone living in the house and Charles had failed to provide her with information that would allow her to do background checks on his roommates.

### (c) K.J.'s Experience in Foster Care

Instead of being placed with Charles after removal in 2012, K.J. was placed in a foster home with one of his brothers. His foster parents, Jenny A. and Kevin A., are licensed with the State of Nebraska. At the termination hearing, Jenny testified that K.J. had been living with them for 2 years and had bonded with them. K.J. tells her he loves her, calls her "mom," and calls Kevin "dad." She and Kevin were willing to continue to provide a safe, stable, and secure environment for them.

Jenny also testified that K.J. had made progress on behavioral issues while in the foster home. When the boys first arrived in 2012, they fought a lot, used "filthy" language, would not listen, and had terrible "meltdowns" and tantrums several times a day. K.J. would put himself in a fetal position on the floor and not talk to her or Kevin. But at the time of the termination hearing, K.J. was a "very good little boy"; Jenny testified that K.J. was smart, loving, well behaved, and healthy. She did not deny that K.J. still had some behavioral problems, but testified that, for the most part, he was a very

well mannered boy. K.J. has gone to therapy regularly, but that the frequency has declined significantly.

### (d) Charles' Relationship With K.J. While in Foster Care

Jenny also testified about K.J.'s interactions with Charles during the time K.J. was in her care. Charles gave K.J. a few gifts: pants and tennis shoes (which did not fit), Legos, a candy bar, and a used Xbox. K.J. also received a birthday card and a letter. Charles' visits seemed to have a negative effect on K.J. After visiting with Charles, K.J. became more insecure and argumentative and he would act up, not wanting her or Kevin to go anywhere without him. Jenny said that when Charles failed to attend several visits, K.J. became angry, and that Jenny and Kevin would have to "talk him up" for the next visit, telling him that Charles loved him and wanted to see him.

While K.J. was in foster care, Charles was initially given a lot of flexibility regarding visitation. The visits were first supervised by family support workers with a local counseling center. But because of the infrequency and inconsistency in Charles' visits, starting January 8, 2014, Charles was eventually allowed only therapeutic visits. Those visits took place in an office setting with K.J.'s therapist present.

Family support workers and K.J.'s therapist testified at the termination hearing. One family support worker testified that there were appropriate displays of affection during the visits. Another worker testified that K.J. appeared to be happy and smiling during a visit. But K.J.'s therapist testified that Charles' visits had a negative impact on K.J. She testified that K.J. did not want to go to visits with Charles and that the visits seemed to cause K.J. anxiety. She said that the inconsistency in Charles' visits affected K.J.'s self-esteem and sense of self-worth.

Their testimony established that during the 22-month period from K.J.'s placement into foster care in October 2012 until

the termination motion was filed on August 27, 2014, Charles visited K.J. eight times for a total of 14 hours. In addition to the eight visits Charles actually attended, six other visits were scheduled, but Charles either canceled those visits or failed to show.

February 19, 2014, was Charles' last visit with K.J. before the termination petition was filed 6 months later. According to Charles, he was not more involved in visits with K.J. because he believed Kristie was going to successfully reunify with the children.

### 5. Juvenile Court's Order

Following the termination hearing, the court found that it should have appointed an attorney for Charles at the adjudication hearing, and for that reason, it denied the State's petition to terminate the parental rights of Charles. The court vacated its January 29, 2015, order terminating Charles' visitation rights and reinstated its prior order, which stated that any visitation between Charles and K.J. must take place in a therapeutic setting. The court instructed Charles that the burden was on him to set up visitation.

## III. ASSIGNMENTS OF ERROR

The State assigns, restated, that the juvenile court erred in declining to terminate Charles' parental rights without considering grounds (1) through (3) as listed under § 43-292. The GAL assigns the same error and also assigns that the juvenile court erred in not terminating Charles' parental rights to K.J.

## IV. STANDARD OF REVIEW

[1] Statutory interpretation is a question of law that an appellate court resolves independently of the trial court.[2]

---

[2] *State v. Mendoza-Bautista*, 291 Neb. 876, 869 N.W.2d 339 (2015); *State v. Ramirez*, 285 Neb. 203, 825 N.W.2d 801 (2013); *State v. Dixon*, 282 Neb. 274, 802 N.W.2d 866 (2011).

[2] An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings.[3]

## V. ANALYSIS

### 1. Jurisdiction

[3] Before reaching the legal issues presented for review, it is the power and duty of an appellate court to determine whether it has jurisdiction over the matter before it, irrespective of whether the issue is raised by the parties.[4]

[4] For an appellate court to acquire jurisdiction of an appeal, there must be a final order entered by the court from which the appeal is taken.[5] Under Neb. Rev. Stat. § 25-1902 (Reissue 2008), the three types of final orders which may be reviewed on appeal are (1) an order which affects a substantial right in an action and which in effect determines the action and prevents a judgment, (2) an order affecting a substantial right made during a special proceeding, and (3) an order affecting a substantial right made on summary application in an action after a judgment is rendered.[6]

This case involves the second type of final order—an order affecting a substantial right made during a special proceeding. The terms "special proceeding" and "substantial right" are not defined by statute, but have been interpreted by case law. Our case law establishes that a proceeding

---

[3] *In re Interest of Enyce J. & Eternity M.*, 291 Neb. 965, 870 N.W.2d 413 (2015).

[4] *In re Estate of Rose*, 273 Neb. 490, 730 N.W.2d 391 (2007).

[5] See, Neb. Rev. Stat. § 43-2,106.01 (Cum. Supp. 2014); *In re Interest of Jassenia H.*, 291 Neb. 107, 864 N.W.2d 242 (2015).

[6] *Kilgore v. Nebraska Dept. of Health & Human Servs.*, 277 Neb. 456, 763 N.W.2d 77 (2009).

before a juvenile court is a special proceeding for appellate purposes.[7]

[5] Therefore, the focus of our jurisdictional inquiry is on whether the juvenile court's order affected a substantial right. We find that it does. We have explained that a substantial right is affected if an order affects the subject matter of the litigation, such as diminishing a claim or defense that was available to the appellant prior to the order from which the appeal is taken.[8]

The State has an interest in protecting the welfare of its resident children.[9] Whether the order affects the substantial rights of the parties necessarily depends on the substance of the order. The juvenile court's order stated that "the Court does not feel it is in a position to terminate the parental rights of [Charles] at this time." Because the juvenile court made no reference to taking the case under advisement, we interpret this statement to be a denial of the State's motion to terminate Charles' parental rights. The order affected the State's right to protect the welfare interests of its resident child, K.J., which was a substantial right, and we therefore have jurisdiction.

## 2. Juvenile Court's Failure to Consider § 43-292(1) Through (3)

We next consider whether the juvenile court erred when it denied the State's motion to terminate parental rights without considering whether termination of parental rights was in the child's best interests or justified under grounds (1) through

---

[7] *In re Interest of Jassenia H., supra* note 5; *In re Interest of Meridian H.*, 281 Neb. 465, 798 N.W.2d 96 (2011); *In re Interest of Thomas M.*, 282 Neb. 316, 803 N.W.2d 46 (2011); *In re Interest of Ty M. & Devon M.*, 265 Neb. 150, 655 N.W.2d 672 (2003); *In re Interest of Anthony R. et al.*, 264 Neb. 699, 651 N.W.2d 231 (2002); *In re Interest of Clifford M. et al.*, 258 Neb. 800, 606 N.W.2d 743 (2000).

[8] *Id.*

[9] *In re Interest of Karlie D.*, 283 Neb. 581, 811 N.W.2d 214 (2012).

(3) of § 43-292. The court did so because Charles was not provided with counsel in the proceedings leading up to K.J.'s adjudication. The State claims this was error, and we agree.

[6] We have previously held that so long as a parent was afforded due process of law, a defect during the adjudication phase does not preclude consideration of termination of parental rights pursuant to § 43-292(1) through (5).[10] Thus, so long as Charles was provided due process of law, the juvenile court's failure to provide Charles with counsel during the adjudication phase does not preclude consideration of termination of parental rights pursuant to § 43-292(1) through (3).

Charles was afforded due process in the termination proceedings. At the first hearing on the State's petition to terminate, Charles was advised of the nature of the proceeding, the potential consequences, and his rights, as required by § 43-279.01. All evidence necessary to decide the termination issue was adduced at the termination hearing while Charles was represented by counsel.

Charles argues that the denial of counsel misled him to "believe that he did not need to be involved in the case" and that had "he been appointed counsel from the very beginning, he could have had the help of an attorney to navigate this matter."[11] But one of the bases for termination of Charles' parental rights was that Charles abandoned K.J. for at least 6 months immediately preceding the filing of the termination petition. With respect to that allegation, we cannot say that Charles' failure to visit K.J. was the court's fault. Due process in a termination proceeding does not require that the parent be advised that he or she should be involved in the child's life.

Charles was afforded due process, and we conclude that the juvenile court erred in denying the State's motion to terminate

---

[10] See *In re Interest of Joshua M. et al., supra* note 1.

[11] Brief for appellee Charles at 29-30.

parental rights without considering whether termination of parental rights was in the child's best interests or justified under grounds (1) through (3) of § 43-292.

### 3. TERMINATION OF CHARLES' PARENTAL RIGHTS

Because the juvenile court should have considered whether Charles' parental rights should be terminated pursuant to § 43-292(1) through (3), we make that determination upon our de novo review.

[7] In order to terminate parental rights, a court must find by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that the termination is in the child's best interests.[12] The State has alleged that termination of Charles' parental rights is in K.J.'s best interests and that five of the grounds listed within § 43-292 (grounds (1) through (3), (6), and (7)) exist. However, the State and the GAL request that we consider grounds (1) through (3). Those grounds are as follows:

(1) The parents have abandoned the juvenile for six months or more immediately prior to the filing of the petition;

(2) The parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection; [and]

(3) The parents, being financially able, have willfully neglected to provide the juvenile with the necessary subsistence, education, or other care necessary for his or her health, morals, or welfare or have neglected to pay for such subsistence, education, or other care when legal custody of the juvenile is lodged with others and such payment ordered by the court.

---

[12] See *In re Interest of Kendra M. et al.*, 283 Neb. 1014, 814 N.W.2d 747 (2012).

(a) § 43-292(1)

[8,9] For purposes of § 43-292(1), "abandonment" is a parent's intentionally withholding from a child, without just cause or excuse, the parent's presence, care, love, protection, maintenance, and the opportunity for the display of parental affection for the child.[13] To prove abandonment in determining whether parental rights should be terminated, the evidence must clearly and convincingly show that the parent has acted toward the child in a manner evidencing a settled purpose to be rid of all parental obligations and to forgo all parental rights, together with a complete repudiation of parenthood and an abandonment of parental rights and responsibilities.[14]

[10] A parent's abandonment of his or her child for 6 months or more immediately prior to the filing of a petition to terminate parental rights is a ground for termination of such rights under § 43-292(1). In this case, the petition to terminate Charles' parental rights was filed on August 27, 2014. Thus, the relevant 6-month period is from February 27 to August 27, 2014.[15] We have said that a court reviewing a termination of parental rights case on the ground of abandonment need not consider the 6-month period in a vacuum.[16] Instead, the court may consider evidence of a parent's conduct, either before or after the statutory period, in determining whether the purpose and intent of that parent was to abandon his or her children.[17]

Clear and convincing evidence supports that Charles abandoned K.J. for at least 6 months prior to the filing of the

---

[13] *In re Interest of Gabriella H.*, 289 Neb. 323, 855 N.W.2d 368 (2014); *In re Interest of Justine J. & Sylissa J.*, 288 Neb. 607, 849 N.W.2d 509 (2014).

[14] *In re Interest of Gabriella H., supra* note 13; *Kenneth C. v. Lacie H.*, 286 Neb. 799, 839 N.W.2d 305 (2013).

[15] See *In re Interest of Gabriella H., supra* note 13.

[16] See *id.*

[17] See *id.*

termination petition. Not only does Charles admit that he did not visit K.J. during the 6-month period before the petition to terminate his parental rights was filed, but prior to that, Charles had minimal contact with K.J. During the 22-month period from when K.J. went into foster care in October 2012 until the petition was filed in August 2014, Charles visited K.J. only eight times for a total of 14 hours. We also consider that Charles either failed to show or canceled almost as many visits as he attended during that time.

Further, there were significant gaps in time between Charles' visits during that 22-month time period. In addition to the 6-month gap preceding the filing of the termination petition, the evidence shows that there were two 3-month gaps and one 5-month gap in which Charles did not visit K.J. We note that 3 months is a long time for a parent to go without seeing his or her child; it is perhaps perceived by a child as an even longer period of time for the child to go without seeing his or her parent.

We find no just cause or excuse for Charles' failure to maintain a relationship with K.J. Charles claims he "was taking a step back," because he believed that Kristie was going to successfully reunify with K.J.[18] But K.J.'s reunification with Kristie would not have precluded Charles from caring for K.J. or being present in K.J.'s life.

[11,12] Abandonment is not an ambulatory thing the legal effects of which a parent may dissipate at will by token efforts at reclaiming a discarded child.[19] Parental obligation requires a continuing interest in the child and a genuine effort to maintain communication and association with that child.[20] We conclude that Charles' sporadic, insubstantial

---

[18] Brief for appellee Charles at 33.

[19] *Kenneth C. v. Lacie H., supra* note 14; *In re Adoption of David C.*, 280 Neb. 719, 790 N.W.2d 205 (2010); *In re Interest of Sunshine A. et al.*, 258 Neb. 148, 602 N.W.2d 452 (1999).

[20] *Id.*

efforts to maintain a relationship with K.J., combined with Charles' failure to visit K.J. in the 6 months prior to the filing of the termination petition, constitute clear and convincing evidence that Charles abandoned K.J. within the meaning of § 43-292(1).

Because § 43-292 requires that the State prove only one of the enumerated statutory grounds for termination of parental rights, we need not review the other alleged bases for termination of those rights.[21]

We next consider whether there is sufficient evidence to establish by clear and convincing evidence that it is in K.J.'s best interests that Charles' parental rights be terminated.

### (b) Best Interests of K.J.

[13-15] A child's best interests are presumed to be served by having a relationship with his or her parent.[22] This presumption is overcome only when the State has proved that the parent is unfit. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being.[23] The best interests analysis and the parental fitness analysis are fact-intensive inquiries. And while both are separate inquiries, each examines essentially the same underlying facts as the other.[24]

In considering Charles' fitness as a parent and whether termination of Charles' parental rights are in K.J.'s best interests,

---

[21] See *In re Interest of Joshua M. et al., supra* note 1.

[22] See, *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015); *Kenneth C. v. Lacie H., supra* note 14; *In re Interest of Kendra M. et al., supra* note 12; *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012).

[23] *In re Interest of Jahon S., supra* note 22.

[24] *Id.*

we cannot ignore Charles' criminal history. The record shows that Charles has been convicted of a number of drug charges and other felony charges during K.J.'s lifetime, including a violent crime against Kristie while she was holding K.J., who was then an infant. Among other crimes, Charles was convicted of possession with intent to distribute cocaine, possession of marijuana, and attempted tampering with a witness in 2005. In 2010, Charles was charged with delivery of a controlled substance, which was reduced to attempted possession.

As a result of Charles' criminal conduct, he has been incarcerated several times throughout K.J.'s life, making it impossible for him to be consistently present in K.J.'s life or provide him with proper care and support. The record shows that Charles was in jail or prison, at least, from February 2005 to January 2006; for 30 days in 2007; for 30 days in 2008; and from December 2010 until June 2011.

Moreover, Charles does not appear able to act in K.J.'s best interests. Although K.J. has struggled with anxiety, attention deficit hyperactivity disorder, and other behavioral problems, Charles testified that he did not agree with K.J.'s being treated with medication or with K.J.'s seeing a psychiatrist or counselor.

Additionally, Charles has a history of leaving K.J. unsupervised. When K.J. was 4 years old and was supposed to be in Charles' care, the police found K.J. wandering the street in the middle of the night. The week before K.J. was removed from his home and placed into foster care, Charles left 7-year-old K.J. in his apartment for 7 days. Charles claims that he arranged for his two neighbors, one who was a convicted felon charged with child abuse and another who did not testify, to watch K.J. We find Charles' evidence about the extent of his supervision unconvincing. Moreover, even if K.J. *were* fully supervised, we question Charles' choice of supervisors and are concerned that Charles expresses no regret for that choice. Although these incidents have not resulted in physical harm to K.J., it is clear that it had a negative effect on K.J.'s

sense of well-being; i.e., he has developed a fear of being left alone.

To the extent that Charles was present in K.J.'s life, the testimony of K.J.'s therapist and foster mother indicate that Charles' interactions affected K.J. negatively and that K.J. does not want a relationship with Charles.

Considering all the evidence, we conclude there is clear and convincing evidence that termination of Charles' parental rights is in K.J.'s best interests.

## VI. CONCLUSION

Upon our de novo review, we conclude that the State proved by clear and convincing evidence that Charles abandoned K.J. and that the termination of his parental rights was in K.J.'s best interests. We therefore reverse the decision of the juvenile court, and we remand the cause with directions to vacate its order filed May 21, 2015, and enter an order terminating Charles' parental rights to K.J.

REVERSED AND REMANDED WITH DIRECTIONS.

HEAVICAN, C.J., not participating.