IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF MADISON B. & OLIVIA B.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF MADISON B. AND OLIVIA B.,
CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

CHERI G., APPELLANT.

Filed April 21, 2020.   No. A-19-786.

Appeal from the Separate Juvenile Court of Lancaster County: REGGIE L. RYDER, Judge. Affirmed.

Troy J. Bird, of Hoppe Law Firm, L.L.C., for appellant.

Patrick Condon, Lancaster County Attorney, and Maureen Lamski for appellee.

MOORE, Chief Judge, and RIEDMANN and WELCH, Judges.

RIEDMANN, Judge.

INTRODUCTION

Cheri G. appeals the order of the separate juvenile court of Lancaster County which terminated her parental rights to her minor children. Upon our de novo review of the record, we affirm.

BACKGROUND

Cheri is the mother of two daughters: Madison G., born in 2010, and Olivia G., born in 2012. Throughout the case, Cheri was married to Jose G. Jose is not the biological father of

Madison or Olivia, but because he is relevant to the factual history of the case, we refer to him as necessary to address the issues raised on appeal.

Madison and Olivia were removed from Cheri and Jose's home in March 2017 upon reports of physical and mental abuse and neglect. The affidavit in support of their removal from the home alleged that the Nebraska Department of Health and Human Services (DHHS) had received intakes in January reporting that Jose had struck Madison in the face, causing her nose to bleed, and in February alleging that the girls were consistently made to stand in the corner and a relative kicked the girls on their buttocks. The caller in February claimed that Cheri was aware of the abuse and reported telling Cheri that Jose was abusive to Olivia, to which Cheri replied, "'[T]hat's because Olivia has a big mouth.'" The caller also reported that Jose had threatened Cheri. The affidavit further alleged that upon investigation of these reports, Madison said that Jose treats her and Olivia like animals, that he made her eat dog treats and rabbit pellets, and that he bit her.

On March 6, 2017, the State filed a petition alleging that Madison and Olivia were children within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) due to the faults or habits of Cheri. An adjudication hearing was held, and subsequently, the children were adjudicated under § 43-247(3)(a). Thereafter, the juvenile court held periodic review hearings as required.

On December 11, 2018, the court held an exception hearing pursuant to Neb. Rev. Stat. §§ 43-292.02 (Cum. Supp. 2018) and 43-292.03 (Reissue 2016) to determine whether an exception existed which would relieve the State of its duty to file a motion to terminate Cheri's parental rights. The court recognized that Madison and Olivia had been removed from the home on March 3, 2017, and had remained in an out-of-home placement since that time. After reviewing the record and evidence received at the hearing, the court found that none of the exceptions provided under the law apply in this case.

The State then filed a motion to terminate Cheri's parental rights to Madison and Olivia on February 6, 2019. The motion alleged that termination was appropriate under Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016) and that termination was in the best interests of the children.

The termination hearing was held on July 11, 2019. The evidence revealed additional details of the abuse the children suffered in the home. There were reports of Jose using "the hook" on the girls, meaning he would hook his thumb or fingers under their tongues and push down really hard, on occasion dragging them around the room. Madison disclosed that Jose would sometimes put her and Olivia in a box in the bathroom on their hands and knees and hold the door shut while forcing them to stay there for long periods of time. There was a photo of Madison in a dog carrier and reports of hitting, kicking, and name-calling. Madison reported that Jose had previously threatened to kill her if she ever revealed what happened in the home. There were also concerns of possible sexual abuse due to Olivia's inappropriate sexual behaviors, collateral information that Cheri and Jose had sex in front of the children, and Madison's report to a relative that Jose had "raped" her. Shortly before the termination hearing was held, the girls began to describe to their therapist the sexual abuse Jose inflicted on them.

Shortly after they were removed from Cheri's care, Madison and Olivia began attending therapy twice per week with provisionally licensed mental health practitioner, Erica Schroeder. Schroeder repeatedly described Madison as an extremely traumatized child. Madison initially

presented as very standoffish, fearful of others, and cautious, whereas Olivia acted overly affectionate with people she did not know and referred to unknown people as "mom." Although the girls presented differently from each other, they both showed no attachment to people and failed to make connections with people.

Throughout the case, both girls continued to struggle with extreme and inappropriate behaviors. Madison would scream profanities during fits of anger, act aggressively when asked to do something, and threaten to hurt other children. Olivia continued to have inappropriate physical contact with animals and other adults and struggled with appropriate touching. At one point, Madison was taken to the hospital after making statements that she wanted to die and that it would be better if she was not here anymore. And at a later time, Olivia began taking medication to help alleviate homicidal thoughts. Both girls were expelled from several daycare centers due to their violent behaviors, and they struggled to control their behavior at school.

Cheri had visitation with the girls for the first several months of the case. However, in September 2017, Schroder expressed concerns to the caseworker that Cheri was trying to "coach" Madison during visits because Madison had reported during therapy that the only reason she was placed out of home was because Cheri said that she lies a lot and that if she stops lying she can go home. Visitation was therefore suspended beginning in December.

Once visitation ceased, the children's behaviors began to regulate, and they began communicating more openly to Schroeder about their thoughts and feelings. Both girls would become angry and upset when talking about Jose and commented that they wanted him to go to jail. They used foul language when describing him and said they hated him. At one point, Madison stated that she wished Jose was dead. The girls continued to express extreme fear of Jose during the entirety of the case. They were never allowed contact with him after they were removed from the home.

Throughout the case, Cheri participated in and completed the services DHHS offered to her, including an initial diagnostic interview and the recommended individual therapy, family support services, and a parenting class. Despite this, the record documents ongoing concerns by the caseworkers that Cheri was unable or unwilling to acknowledge the abuse Jose inflicted on Madison and Olivia. In January 2018, the caseworker indicated that it was apparent that Cheri continued to not understand why the children had been removed or accept that any part of what the children had reported was true. In October, the caseworker again expressed concern that Cheri had not acknowledged the reason for the removal of the children; rather, she denied any wrongdoing by her or Jose and had not acknowledged the abuse and neglect that the girls had reported. Two months later, the caseworker again said that there were continuing concerns that Cheri had yet to acknowledge the reason for the removal of the girls or all of the abuse and neglect that they had reported.

In May 2018, Cheri and the girls began exchanging letters with the approval of Schroeder. The girls had various reactions to Cheri's letter writing and were apprehensive to participate. In September, Schroeder arranged a family therapy session between Cheri and each of her daughters separately. Each of the children mentioned Jose's use of "the hook" to Cheri along with other abuse that occurred, but Cheri showed no reaction, acknowledgment, or empathy toward her children. At the end of each session, Cheri said to each of her children, "See you when I see you."

When Schroeder spoke with Cheri a few days later, Cheri said that she is in a difficult position between Jose and her children and said that people "have the wrong idea" about Jose and that he is not abusive.

After these September sessions, Schroeder recommended no additional family sessions until Cheri sought further individual therapy in order to help her process her own history of trauma and gain the ability to empathize and provide validation to her children. Schroeder opined that continuing family sessions without Cheri completing these components would damage the progress the girls had made in treatment and not be in the children's best interests.

Cheri returned to individual therapy in November 2018 and continued attending through the time of the termination hearing. In February 2019, Schroeder arranged a therapeutic visit between Cheri and her children by phone. The conversation was not beneficial for the children, however, and their behaviors began to escalate thereafter such that Schroeder did not feel additional phone contact with Cheri was in the children's best interests.

In May 2019, Cheri wrote a letter to Madison and Olivia. Therein, she explained that she wanted to try to answer their question about why she had not left Jose, stating that she cares very much about him and that she also cares very much about her children. She wrote that she feels that Jose is working hard to make their home a safe place for Madison and Olivia, and that she, too, was working toward making the home safe. Schroeder did not share the letter with Madison or Olivia.

At the time of the termination hearing, Madison and Olivia had been living in their current foster placement since October 2018. Madison had just turned 9 years old and was attending Behaven Kids, an organization designed to assist children with behavioral or mental health issues. Her therapist there testified that Madison's behaviors had become out of control at home and at school, precipitating the referral. She reported that Madison had expressed concerns about not wanting to be returned home because she did not feel safe, and the therapist explained that if Madison did not feel safe, she would continue to act out. She explained that Madison acts out because of her distrust of people as a result of feeling unsafe at a point in her life. The therapist stated that if children feel unsafe at an early age, it takes a long time to rebuild their trust, and they have to be in very loving relationships and feel safe before they can begin trusting people. According to the therapist, Madison is very slowly making progress on learning how to trust people. The therapist explained that children in general need permanency to feel a sense of safety and belonging, and specifically for Madison and her behaviors, she needs permanency and a regular routine with people who love and support her to help her emotional development in order to rebuild trust and feel the safety and love that she needs in order to continue to progress.

Olivia was 6 years old at the time of the termination hearing and continued to become escalated at school, run out of class, and become upset when trying to work through her emotions. She was expelled from her daycare in June 2019 for kicking, hitting, slapping, punching, and pulling down a child's pants; so her foster mother found a nanny for her and reported that Olivia was doing better in the more structured environment provided by the nanny.

As of the time of the termination hearing, Cheri was still attending individual therapy and making progress working through her history of childhood abuse and neglect. In a letter dated 2 days before the hearing, Cheri's therapist wrote that Cheri understands that Jose's physical abuse

of the girls has left them fearful; however, Cheri denied having witnessed most of the abuse and tends to minimize both the severity and the lasting impact it has had on the girls. Instead, Cheri believes their current negative and extreme behaviors may be the result of many factors, given their history of multiple foster placements.

The therapist indicated that Cheri continues to doubt that some of what the girls have reported in their therapy is accurate and maintains that until she hears the girls describe the physical abuse by Jose to her directly, she cannot conclude that it actually occurred as they have described it to Schroeder and the caseworker. The letter explains that Madison and Olivia had recently made additional reports that they were sexually abused and identified Jose as their perpetrator. Cheri's therapist said that she shared this information with Cheri, and while Cheri did believe that the girls may have been sexually abused, she did not believe that Jose could have sexually assaulted and threatened them in the manner they described. The therapist indicated that she would continue to work with Cheri regarding the impact of trauma on children and how and why victims typically report abuse over time. In addition, she would share information with Cheri regarding the secretive, manipulative, and coercive methods that some offenders use to gain and maintain sexual access to children.

Schroeder did not believe that it would be in the best interests of the children to return them to Cheri. Both girls have indicated strongly that they do not want to return because it is a dangerous situation for them, and they both have high anxiety and fear associated with home. Schroeder was asked whether she believed, based on her experience of working with the girls, that it would be possible to reunify them with Cheri at some point, and she said no because of Cheri's unwillingness to leave Jose. She said that even the possibility of reunification "would be torturing them." She was asked about the possibility of reunifying the children with Cheri without taking Jose into consideration, and she said it could be possible if there was a complete understanding that Cheri was no longer with Jose and had no contact with him, Cheri continued individual therapy, and they worked on rebuilding the girls' trust in Cheri. But Schroeder added that she did not know "how many years that would take." Likewise, the current caseworker testified at the termination hearing that DHHS believes that terminating Cheri's parental rights is in the children's best interests because of the length of time the girls have been out of home; their high behaviors and needs; and their need to be in a stable, secure, and safe environment.

Thereafter, the juvenile court entered an order terminating Cheri's parental rights to Madison and Olivia. The court found that it was readily apparent that the children endured extensive trauma while living with Cheri and Jose and that both children had an ongoing and consistent fear of Jose. The court found that it was "beyond obvious" to anyone who had reviewed the reports received at the numerous review hearings that the children's fear of Jose has never abated or subsided but that Cheri continued to stay with Jose and justify her decision to do so. The court found that throughout the case, Cheri complied with the services DHHS provided to her, but in reality, "she just went through the motions" and did not make the changes she needed to make in order for the children to return home.

The court found that the primary issue in the case had been Cheri's continued denial that the abuse the girls suffered at the hands of Jose even took place. Cheri was consistently unwilling or unable to acknowledge the reason the girls were removed and consistently voiced that neither

she nor Jose did anything wrong. The juvenile court noted its surprise that Cheri testified that she only recently learned that her girls fear Jose and noted that despite that discovery and everything else that has happened, Cheri continues to stand by the man who abused her children. The court said that Cheri decided to choose her husband over her children. Thus, the court determined that Cheri had more than enough time and supports to put herself in a position for the girls to return home but that she had been unwilling or unable to rehabilitate herself within a reasonable period of time, such that the best interests of the children require termination of Cheri's parental rights. The court therefore found by clear and convincing evidence that termination was appropriate under § 43-292(2), (6), and (7), and was in the best interests of the children. Cheri appeals.

## ASSIGNMENTS OF ERROR

Cheri assigns, renumbered, that the juvenile court erred in (1) determining that she had substantially and continuously neglected and refused to provide the children necessary parental care and is unfit to parent them now and in the future, (2) terminating her parental rights when the State failed to provide reasonable efforts at reunification, and (3) determining that no exception existed to allow her more time to reunite with her children.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Zoie H.*, 304 Neb. 868, 937 N.W.2d 801 (2020).

## ANALYSIS

*Termination of Cheri's Parental Rights.*

Cheri assigns that the juvenile court erred in determining that she had substantially and continuously neglected and refused to provide the children necessary parental care. In other words, she argues that the court erred in terminating her parental rights pursuant to § 43-292(2).

In order to terminate parental rights, a court must find by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that the termination is in the child's best interests. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016). In the instant case, the State sought to terminate Cheri's parental rights pursuant to § 43-292(2), (6), and (7).

Under § 43-292(7), the State must prove that the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. Here, the children were removed from Cheri's care in March 2017, and they remained placed outside the home throughout the duration of the case. The State filed the motion to terminate Cheri's parental rights in February 2019. Thus, at that time, the children had been in an out-of-home placement for 23 months. The State therefore presented clear and convincing evidence to satisfy § 43-292(7).

Section 43-292 requires that the State prove only one of the enumerated statutory grounds for termination of parental rights. See *In re Interest of Isabel P. et al., supra*. Because we conclude that there is sufficient evidence that the children have been in an out-of-home placement for 15 or

more months of the most recent 22 months, we need not address the other statutory grounds which the juvenile court found to exist.

We note that Cheri also assigns that the juvenile court erred in terminating her parental rights because the State failed to provide her reasonable efforts to help her reunite with her children. Neb. Rev. Stat. § 43-283.01(2) (Cum. Supp. 2018) requires the State to make reasonable efforts to preserve and reunify the family subject to certain exceptions not applicable here. However, § 43-283.01 is incorporated only into § 43-292(6), not into the remaining subsections of § 43-292. *In re Interest of DeWayne G. & Devon G.*, 263 Neb. 43, 638 N.W.2d 510 (2002); *In re Interest of Andrew M. et al.*, 11 Neb. App. 80, 643 N.W.2d 401 (2002). Because we have determined that termination was proper pursuant to § 43-292(7) and that the State need establish only one of the statutory grounds enumerated in § 43-292, § 43-283.01 is not applicable to this case. See *In re Interest of Andrew M. et al., supra.* We therefore need not specifically address Cheri's argument regarding reasonable efforts.

However, the evidence adduced to prove termination on any statutory ground other than § 43-292(7) is highly relevant to the best interests of the children, as it would show abandonment, neglect, unfitness, or abuse, and thus, whether the State proved by clear and convincing evidence grounds for termination under § 43-292(6) is highly relevant to a determination of the children's best interests. See *In re Interest of Shelby L.*, 270 Neb. 150, 699 N.W.2d 392 (2005). We will therefore consider Cheri's arguments relating to reasonable efforts in the context of her unfitness and the best interests of the children.

A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016). This presumption is overcome only when the State has proved that the parent is unfit. *Id*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Id*. The best interests analysis and the parental fitness analysis are fact-intensive inquiries. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*.

Cheri argues that the court erred in finding her unfit to parent her children when she successfully completed all services offered to her and when her progress was blocked by Schroeder. Although Cheri completed the services that DHHS provided, the barrier to reunification that continued throughout the entirety of the case was Cheri's unwillingness or inability to acknowledge the abuse or trauma the children endured while living with her and Jose. The record is replete with concerns that Cheri continued to deny any wrongdoing, refused to acknowledge or admit that Jose had done anything wrong, and did not believe the girls' reports of abuse.

In a letter dated just 2 days before the termination hearing, Cheri's therapist wrote that Cheri continued to doubt some of what the children had reported and did not believe that Jose could have sexually assaulted and threatened them in the manner that they had just recently described. While testifying at the termination hearing, Cheri was asked whether she believed the girls' reports of their abuse by Jose, and she said that she believed "some of them." She was asked whether she viewed Jose as a safety risk for the children, and she did not "exactly know how to

answer that" question. She testified that if she was asked to move out of Jose's house, she would do so in order to get her children back, but when asked whether that was the only reason she would move out, she responded, "I mean I feel safe around him. So --."

Cheri claims that any progress she made during the case was blocked by Schroeder, because visitation remained suspended throughout most of the case based on Schroeder's recommendation. Visitation was initially suspended in June 2017 because Schroeder expressed concerns that Cheri was trying to "coach" Madison during visits. Visits remained suspended because the girls continued exhibiting extreme behaviors and expressing fear of Jose. When therapeutic sessions were attempted in September 2018, Madison and Olivia each talked with Cheri about things Jose had done to her, but Cheri did not react to or acknowledge their disclosures or empathize with their feelings. Afterward, Cheri explained to Schroeder that she was in a "difficult position" between Jose and her children and claimed that "people have the wrong idea about [Jose] and he's not abusive."

The children's behaviors increased after meeting with Cheri, and Schroeder recommended that no additional family sessions occur until Cheri sought treatment to deal with her own history of trauma in order to learn how to empathize with the children and validate their feelings and experiences. Nevertheless, a therapeutic visit by phone between Cheri and the girls was attempted in February 2019, but according to Schroeder, it was not beneficial for the girls. The girls started having negative behaviors associated with the conversation, so she did not attempt any additional phone conversations or therapeutic visits after that. Thus, Schroeder's recommendation that visitation between Cheri and the girls remain suspended, while potentially hindering an attempt at repairing the bond between Cheri and the children, was done because the children reacted negatively to their therapeutic visits with Cheri, and Cheri was unable or unwilling to validate their traumatic history and feelings in that regard.

As referenced above, Cheri asserts that DHHS failed to provide reasonable efforts aimed at reunifying her with her children. She specifically claims that her leaving Jose was DHHS' "informal" position in order for reunification to occur but that DHHS never offered services to assist her in establishing an independent household away from Jose. Brief for appellant at 12. Each of the three caseworkers assigned to the case, however, testified at the termination hearing that it was not DHHS' position that Cheri had to leave Jose in order to achieve reunification. And throughout the 28 months from the time the children were removed to the time of the termination hearing, the children had not made sufficient progress to return to Cheri, with or without Jose in the home. At the time of the hearing, the girls were still exhibiting extreme behaviors, such that Madison had been referred to Behaven Kids just three months prior to the hearing and Olivia had been expelled from her daycare the month before the hearing. Therefore, although we disagree with Cheri that her leaving Jose was required before reunification could occur, the children were not in a position to achieve reunification at any point during the case whether Cheri was living with Jose or independently.

More concerning and relevant to the question of Cheri's unfitness as a parent, however, is her position regarding Jose. She was still married to him and living with him at the time of the termination hearing. On several occasions, including at the hearing, she indicated that she would leave Jose if it would help her get her children back, but she remained with him and continued to

justify her decision to do so. In a May 2019 letter to the children, Cheri stated that she wanted to try to explain why she had not left Jose, writing that she cares very much about him and believed that he was working hard to make their home safe for the children.

At the termination hearing, Cheri testified that although she had received copies of the court reports detailing the allegations the children had made against Jose dating back to the beginning of the case, she had just recently realized that her children were afraid of him. She stopped short of acknowledging that he was a safety risk to the children and said that she felt safe around him. Thus, despite having attended individual therapy throughout the case, it does not appear that Cheri gained any insight into why her relationship with Jose was a problem, as opposed to simply believing that the relationship might be a barrier to reunification with the children. In other words, it is concerning that Cheri wanted to continue her relationship with someone who abused and terrified her children, and as the juvenile court articulated, Cheri was choosing Jose over her children.

Ultimately, Schroeder opined that it would not be in the children's best interests to return to Cheri. Both girls have strongly indicated to her that they do not want to return home, and they both continue to have high anxiety and fear associated with home. Madison's therapist at Behaven Kids testified that Madison had expressed similar concerns to her, fearing being placed back home with Cheri because she was not safe there.

Schroeder testified that reunification with Cheri was not possible because of Cheri's unwillingness to leave Jose, and that even the possibility of reunification would be "torturing them." Without taking Jose into consideration, Schroeder thought reunification could be possible if Cheri was no longer with Jose and had no contact with him, if Cheri continued individual therapy, and if they worked on rebuilding the girls' trust in Cheri. But she did not know "how many years that would take."

In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015). Given that 28 months into the case, Cheri remained unwilling or unable to place her children above Jose and the children continued to exhibit extreme behaviors and relay a fear of returning home, resulting in the continued suspension of visitation with Cheri, the record does not establish that Cheri has made continued improvement or that a beneficial bond between her and the children exists. And it does not appear that permanency with Cheri could be achieved in the foreseeable future. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). Accordingly, we find that the clear and convincing evidence establishes that Cheri is unfit and that terminating her parental rights is in the best interests of the children.

*Exception to Filing Motion to Terminate Parental Rights.*

Cheri also assigns that the juvenile court erred in determining that no exception existed under § 43-292.02 to allow her more time to reunite with her children.

We first address the State's argument that this issue is not properly before this court. As the State notes, the juvenile court determined that no exception existed in an order filed in

December 2018, months prior to the order terminating Cheri's parental rights. The Nebraska Supreme Court, however, has ruled that an order by the juvenile court finding that no exception exists under § 43-292.02 is not a final, appealable order because it does not affect a substantial right of the parent. See *In re Interest of Anthony R. et al.*, 264 Neb. 699, 651 N.W.2d 231 (2002). The filing of a termination pleading, standing alone, does not affect any substantial right of a parent. *Id*. If such a petition is filed pursuant to the court's order, the parent will receive notice and an opportunity to be heard in accordance with statutorily prescribed procedures. *Id*. If the filing of a petition for termination of parental rights ultimately results in an order adverse to the parent, it is well established that such an order is final and appealable. *Id*. Thus, Cheri could not have appealed the December 2018 order because it was not a final order.

Cheri now argues that the court should have found an exception under § 43-292.02, which would have allowed her additional time to work toward reunification. This conclusion does not logically follow, however. The State is obligated to file a petition to terminate the parental rights of a parent if the child has been in foster care under the responsibility of the State for 15 or more months of the most recent 22 months. § 43-292.02(1). Within 30 days after the 15-month period under § 43-292.02(1), the court shall hold a hearing on the record and shall make a determination on the record as to whether there is an exception under § 43-292.02(3) in this particular case. § 43-292.03(1).

The purpose of an exception hearing, derived from the plain language of § 43-292.03(1), is to determine whether the State may be excused from the mandatory requirement of § 43-292.02(1) that it file a petition to terminate parental rights under certain circumstances, including those where a juvenile has been in foster care under the responsibility of the State for 15 of the most recent 22 months. *In re Interest of Clifford M. et al.*, 261 Neb. 862, 626 N.W.2d 549 (2001). The State is not *required* to file a petition to terminate if the juvenile court determines at the exception hearing that any of the circumstances specified in § 43-292.02(3) exist. *In re Interest of Clifford M. et al., supra*. If such circumstances are not shown, § 43-292.03(1) provides that the State shall proceed as provided in subsection (1) of section 43-292.02, which requires the filing of a petition to terminate parental rights under specified circumstances. *In re Interest of Clifford M. et al., supra*. While an exception hearing may afford a basis for *relieving* the State of its statutory obligation to file a petition to terminate under § 43-292.02(1), neither § 43-292.02 nor § 43-292.03 would *prevent* the State from petitioning for termination of parental rights under § 43-292 even if it were not required to do so. See *In re Interest of Clifford M. et al., supra*.

Stated differently, once a child has been in an out-of-home placement for the 15-month period, the State is generally required to file a petition to terminate the parental rights of the child's parents, subject to the outcome of the exception hearing. If the juvenile court finds that no exception under § 43-292.02(3) exists, the State remains obligated to file the termination petition. If the court determines that a statutory exception does exist, the State is no longer required to file the petition; however, it may elect to do so anyway. In other words, the State may choose to file the termination petition after the 15-month period regardless of the outcome of the exception hearing.

We therefore do not agree with Cheri that had the juvenile court found an exception in this case, she would have had additional time to work toward reunification. To the contrary, at the

exception hearing, the State argued that no exception existed due to the amount of time the case had been ongoing and the extent, or lack thereof, of Cheri's participation. It is therefore reasonable to infer that even if an exception had been found, the State would have chosen to move forward with the filing of the termination petition, rather than allowing Cheri additional time to work toward reunification.

CONCLUSION

For the foregoing reasons, upon our de novo review of the record, we affirm the order of the juvenile court terminating Cheri's parental rights to Madison and Olivia.

AFFIRMED.