IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF TRE'VON A.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF TRE'VON A., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ALBERT W., APPELLANT.

Filed September 26, 2017.    No. A-17-193.

Appeal from the Separate Juvenile Court of Douglas County: CHRISTOPHER KELLY, Judge. Affirmed.

Matthew R. Kahler, of Finley & Kahler Law Firm, P.C., L.L.O., for appellant.

Donald W. Kleine, Douglas County Attorney, Jennifer C. Clark, and Laura Elise Lemoine, Senior Certified Law Student, for appellee.

MOORE, Chief Judge, and BISHOP and ARTERBURN, Judges.

ARTERBURN, Judge.

INTRODUCTION

Albert W. appeals form an order of the juvenile court of Douglas County which terminated his parental rights to his minor child, Randi A. The juvenile court found that grounds existed under Neb. Rev. Stat. § 43-292(1), (2), (7), and (9) (Reissue 2016) and that the termination of his parental rights was in Randi's best interests. Upon our de novo review of the record, we affirm the decision of the juvenile court.

- 1 -

BACKGROUND

This juvenile court proceeding involves one child, Randi, born in 2011. Randi came under the jurisdiction of the juvenile court on August 6, 2013, and has been in out of home placement from that date forward. The State filed a Third Supplemental Petition and Termination of Parental Rights on August 29, 2016, alleging that Randi came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). Specifically, the petition alleged that Randi lacked proper parental care by reason of the fault or habits of Albert, Albert failed to provide safe, stable and appropriate housing for Randi, Albert failed to have any contact with Randi in the six months prior to the filing of the petition, Albert failed to provide emotional or financial support to Randi, Albert failed to place himself in a position to parent Randi, and that due to these allegations, placed Randi at risk for harm. The petition also alleged that Albert had abandoned and substantially and continuously neglected Randi. The petition alleged that Randi had been in out of home placement for 15 of the most recent 22 months, that aggravated circumstances were present, no reasonable efforts were necessary under the statute and termination was in Randi's best interests.

On November 8, 2016, a termination hearing was held. Albert appeared personally and with counsel. At the hearing, three individuals provided testimony: Kristy Lewis of Nebraska Families Collaborative, Randi's foster mother, and Albert. Three exhibits were received by the juvenile court: a genetic testing report, the affidavit of Lewis, and a notice of objection to adoption authored by Albert.

The first witness called by the State was Lewis. At the time of the hearing, Lewis had worked as a family permanency specialist at Nebraska Families Collaborative for approximately 20 months. Lewis first became involved in this case in May 2015. Lewis testified that she received the case from another permanency specialist and had to review the file and speak with the former specialist to familiarize herself with the case.

Lewis testified that in May 2015, there were two identified possible biological fathers for Randi, Michael J. and Albert. Neither person was listed on Randi's birth certificate, but Kenneth H. was named as the father of Randi on her birth certificate. Kenneth was married to Randi's biological mother when she was born, but was later determined not to be Randi's biological father. Kenneth relinquished his parental rights to Randi on January 20, 2016. Michael filed a Complaint to Intervene in this matter on June 5, 2015, alleging that he was the biological father of Randi. After genetic testing revealed that Michael was not Randi's biological father, Michael withdrew his complaint on January 20, 2016.

Lewis testified that Randi had been removed from her biological mother's care in 2013 and had resided with her foster mother since the removal. Randi's biological mother relinquished her parental rights to Randi on October 21, 2015.

Lewis testified that she had a very short phone conversation with Albert shortly after she was assigned the case in May 2015. Albert was incarcerated in federal prison outside Nebraska at that time. Lewis testified that the previous case worker had sent Albert Lewis' contact information, which is how Albert was able to reach out to her. Albert informed Lewis that he was being transferred to another prison, so Lewis provided Albert with her contact information. Lewis testified that Albert stated that he was possibly the father of Randi.

The next contact Lewis had with Albert was in June 2015 when Albert called her. Lewis testified that the conversation entailed giving Albert information in order to establish paternity. Albert informed Lewis that he would be willing to hire an attorney to establish paternity. Lewis testified that she informed Albert that she was unable to aid Albert until paternity was established. Lewis testified that she sent Albert the appropriate documents to apply for financial aid in order to establish paternity, along with her contact information. In this conversation, Albert informed Lewis that he was incarcerated in Pennsylvania. Lewis testified that she informed Albert that Randi's biological mother was about to relinquish her rights to Randi and that it was possible that adoption proceedings would occur with Randi. According to Lewis, Albert stated he would be willing to establish paternity and that he had known that Randi was potentially his daughter since she was a baby. Lewis testified that she told Albert it was imperative for him to contact her at least once a month so that she could keep him informed on the progress of the case and that she sent him a follow-up letter detailing their conversation. Lewis testified that this follow-up letter was certified and restricted. It was returned to her by the postal service. There was no signature by Albert accepting it.

Lewis testified that after the June 2015 phone conversation with Albert, she was unable to have direct contact with Albert, despite her efforts to locate and reach him, until August 2016. She was made aware that Albert had sent a notice of objection to adoption in October 2015. Lewis testified that she was required to attempt to reach Albert 3 times a month via letter and phone. Lewis testified that given her inability to have contact with Albert, she was unable to set up any type of genetic testing to establish paternity.

Lewis testified that Albert had left her a phone message in late June 2016, provided a phone number, and informed her that he would be residing at a halfway house in Council Bluffs, Iowa. Lewis testified that with this information, she was able to receive a court-order for genetic testing. Lewis testified that the genetic testing was completed in August 2016.

Lewis testified that when she received the genetic testing results, she met with Albert personally in Council Bluffs. Lewis informed Albert that he was Randi's biological father. Lewis testified that Albert requested to see Randi at that time. Lewis informed Albert that she needed to consult with her superiors in order to know if visitation would be appropriate. Lewis testified that Albert stated he was in a halfway house, was employed, and would be staying with his mother after release from the halfway house. Lewis was also informed that Albert had been incarcerated for selling drugs. Lewis once again gave Albert her contact information and related that it was important for him to remain in contact with her.

Lewis testified that she did not have contact with Albert again until a juvenile hearing in September 2016. At the hearing, Albert asked through counsel if visitation was available. Lewis attempted to set up a court-ordered mediation with Albert at that time, but was unable to contact him with the number he provided.

Lewis testified that she was informed by both Randi's foster mother and therapist that within the 3 months prior to the adjudication hearing, there were reports of Randi wetting the bed, experiencing nightmares, clinging to her foster mother, and having other behavioral issues. Lewis also testified that she had also spoken with Randi individually during that timeframe. Lewis testified that Randi had been with the same foster parents since 2013. It was Lewis' ultimate

opinion based on her training and experience that termination of Albert's parental rights was in Randi's best interests. Lewis' reasoning was Randi's worsening behavior, Randi's lack of contact with Albert, and the fact that Lewis does not have any information about whether Albert could care and provide for Randi.

The next witness called by the State was Katherine S., Randi's foster mother. Katherine testified that Randi was first placed in her home when she was 3 days old. Randi remained with Katherine for 8 months. Randi was removed from her biological mother twice more, and has been with Katherine since she was 2 years old. At the time of the termination hearing, Randi was 5 years old.

Katherine testified that since Randi has been in her home, Albert had phoned one time, which was in 2016. Katherine testified that Albert wanted to speak with Randi, but Randi became upset when she heard Albert speaking on the phone and Katherine ended the call. Katherine testified that she blocked the phone number because of how upset Randi became during the phone call. She did not want Randi to answer the phone and speak with Albert. Katherine testified that Albert's family had visited Randi when she was younger, but they had not had contact for a significant period of time.

Katherine testified that in the few months prior to the adjudication hearing Randi's behavior had been worsening. Katherine testified that Randi had experienced nightmares, wet the bed, and had become more attached to her. Katherine testified that in the time Randi has lived with her, she has not received any gifts, letters, or support from Albert.

Albert testified during the termination hearing. Albert testified that he gave a genetic sample for testing the day before he was released from prison, July 31, 2016. Albert testified that he entered prison in May 2011, which was one month before Randi was born. Albert testified that he became aware that he was definitely Randi's father on August 26, 2016. Albert testified that he did not receive any financial forms from Lewis while he was incarcerated.

Albert testified that since he was released from prison, he had been denied visitation with his daughter because it was not court-ordered. Albert testified that he did not inform Lewis that there was a possibility that he was Randi's father in May 2015. Albert stated that he had made phone contact with Lewis between October 2015 and August 2016. As of the time of the hearing, he was living with his mother and was employed. At that time he was in "home confinement" but could leave his residence for work. He testified that he would begin supervised release (with a federal probation officer) in January 2017.

On cross-examination, Albert testified that he was made aware that Randi could potentially be his daughter before her birth. He testified that he had attempted to establish paternity before May 2015, but offered no evidence of specific efforts. Albert made inconsistent statements about whether he had spoken to Randi's biological mother since Randi's birth. Albert testified that he entered prison in May 2011 due to drug distribution. Albert also admitted that he had never spoken with Randi.

Following the termination hearing, the juvenile court entered an order on January 19, 2017, terminating Albert's parental rights to Randi. The juvenile court found that there was clear and convincing evidence to support termination under § 43-292(1), (2), (7), and (9). The juvenile court also found it was in Randi's best interests to terminate Albert's parental rights.

## ASSIGNMENTS OF ERROR

Albert alleges, restated, that the juvenile court erred in finding that the State proved the relevant statutory grounds for termination of his parental rights and finding that termination of his parental rights was in the child's best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of LeVanta S.*, 295 Neb. 151, 158, 887 N.W.2d 502, 509 (2016). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

## ANALYSIS

### STATUTORY GROUNDS

Albert asserts that the juvenile court erred in terminating his parental rights pursuant to § 43-292(1), (2), (7), and (9). Upon our de novo review, we find that the evidence clearly and convincingly demonstrates that Randi was in an out-of-home placement for at least 15 of the most recent 22 months prior to the termination hearing, pursuant to § 43-292(7). As a result, we need not specifically address whether the State presented clear and convincing evidence to demonstrate that termination was also warranted pursuant to § 43-292(1), (2), or (9). See, *In re Interest of Isabel P.*, 293 Neb. 62, 81, 875 N.W.2d 848, 861 (2016).

Termination of parental rights is warranted whenever one or more of the statutory grounds provided in § 43-292 are established. Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Justin H.*, 18 Neb. App. 718, 726, 791 N.W.2d 765, 772 (2010).

At the hearing on the State's motion to terminate Albert's parental rights, there was uncontradicted evidence which demonstrated that Randi was placed into the custody of the juvenile court in 2013. She was physically placed in the home of Katherine, a relative, and her husband and remained in out-of-home placement for the duration of the juvenile court proceedings. As such, by the time the State filed its motion to terminate Albert's parental rights in August 2016, Randi had been in out-of-home placement for approximately 36 months. Accordingly, the requirements of § 43-292(7) were met.

Since there is clear and convincing evidence that termination of Albert's parental rights was warranted pursuant to § 43-292(7), we need not further address the sufficiency of the evidence to demonstrate that termination was also warranted pursuant to § 43-292(1), (2), or (9). See *In re Interest of Isabel P., supra*.

### BEST INTERESTS

Since we have declined to address the sufficiency of the evidence demonstrating that termination was also appropriate pursuant to § 43-292(1), (2), or (9), we treat our discussion of whether termination of Albert's parental rights is in Randi's best interests as though § 43-292(7)

is the only statutory basis for termination. In cases where termination of parental rights is based solely on § 43-292(7), the Nebraska Supreme Court has held that appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is, in fact, in the child's best interests. *In re Interest of Aaron D.*, 269 Neb. 249, 260, 691 N.W.2d 164, 173 (2005). In such a situation, because the statutory ground for termination does not require proof of such matters as abandonment, neglect, unfitness, or abuse, as the other statutory grounds do, proof that termination of parental rights is in the best interests of the child requires clear and convincing evidence of circumstances as compelling and pertinent to a child's best interests as those enumerated in the other subsections of § 43-292. *In re Interest of Aaron D., supra.* In meeting its burden, the State must also prove by clear and convincing evidence that Albert is unfit to parent the minor child.

Albert argues that the State failed to present sufficient evidence to prove that termination of his parental rights is in Randi's best interests. He further argues that there was insufficient evidence to prove that he is unfit to parent Randi.

Our de novo review of the record demonstrates that Albert has known that he may be Randi's biological father since her birth in June 2011. Albert was incarcerated one month before Randi's birth. While he was released in August 2016, four months before the hearing, he remained under an order of home confinement and then was to begin supervised release in January 2017. He made no attempt to establish paternity until October 2015 when he executed a notice of objection to adoption. Randi was already four years old at the time. While Albert places much of the blame for his lack of progress on DHHS and his incarceration, there is no evidence that Albert put forth any effort to determine if Randi actually was his child. Additionally, other than a birthday card sent to Randi's biological mother in 2012 for Randi's first birthday, Albert has not made any attempt to act in a parental role or provide support to Randi. While Albert has no burden of proof in this matter, the record is entirely devoid of any information as to Albert's ability to be an appropriate and effective parent. There was some indication in the record that Albert has another biological child, but no evidence relating to Albert's relationship with that child was adduced. There is no evidence that Albert attempted to better himself as a parent while incarcerated, such as attending any parenting or self-improvement classes. Nowhere in the record does Albert state that he wants to actually parent Randi beyond having visitation. He failed to appear and participate in permanency mediation as ordered by the juvenile court on September 12, 2016.

Although incarceration cannot be the sole basis for terminating parental rights, it is a factor to be considered. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). See, also, *In re Interest of DeWayne G.*, 263 Neb. 43, 638 N.W.2d 510 (2002). The Nebraska Supreme Court has noted that although incarceration itself may be involuntary as far as a parent is concerned, the criminal conduct causing the incarceration is voluntary. *Id.* In a case involving termination of parental rights, it is proper to consider a parent's inability to perform his or her parental obligations because of incarceration. *Id.* Incarceration, however, does not insulate a person from the termination of his parental rights if the record contains clear and convincing evidence that would support the termination of the rights of any other parent. *Id.*

Although Albert's lengthy incarceration hindered his efforts to determine whether Randi was his child, we find it notable that he took no steps to establish paternity prior to October 2015,

after being given the means to do so by Lewis in June 2015. Even though his objection letter completed in October 2015 stated that he was the biological father of Randi, he did not act in any way to further his paternity claim until June 2016 when he telephoned Lewis. Lewis' telephone number had not changed since May 2015. There is no evidence that Albert had lost her contact information or was otherwise prevented from speaking with Lewis. Instead, Albert made no effort to establish paternity until he was released from prison. While Lewis diligently attempted to contact Albert throughout this period, Albert was largely silent.

The record further demonstrates that not only does Randi view Albert as a stranger, but that her behavior has worsened since she learned about Albert. Both Randi's foster mother and therapist reported that within the 3 months prior to the termination hearing, Randi was wetting the bed, experiencing nightmares, clinging to her foster mother, and having general behavioral issues. The one telephone call that Albert made to Randi's foster mother, which Randi overheard, caused her to become so upset that the foster mother had to end the call. At the time of the termination hearing, Randi was five years old and had never spoken to or met Albert. Randi's therapist recommended that Albert not be allowed visitation due to the distress it caused Randi. Randi has continuously lived with her foster parents for three years, beginning when she was two years old. Randi has developed a strong bond with her foster family, as well as her half-brother who is also placed in her home.

When this case is analyzed through the lens of the child's perspective, the evidence is quite clear that her interests are best served by continuing her placement in the home in which she lives. As stated by the juvenile court:

It is clear to the Court that this five year old child is deserving of *immediate* permanency, after enduring more than three years of uncertainty in the Juvenile Court system. This child is now in a situation familiar and secure to her, which offers this timely permanency.

To deny this permanency at this point for the purpose of giving this father an opportunity to demonstrate that he can parent a child, is the equivalent of starting the whole process over again for this child from square one, with the attendant possibility of separating her from her sibling and from the only stable family she has known. This clearly is not in the child's best interest. (emphasis added).

It is clear that the juvenile court's decision rested largely on these considerations. However, we must consider whether the State proved by clear and convincing evidence that Albert is an unfit parent. Viewed through that lens, the issue becomes more problematic, particularly given the relatively short bill of exceptions existing in this case. However, we are also mindful of the oft-quoted proposition of law when it comes to termination cases. "Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Athina M.*, 21 Neb. App. 624, 631, 842 N.W.2d 159, 164 (2014) (citations omitted). This case sits squarely at the intersection of all these considerations.

First, we must consider Albert's incarceration. Albert began his sentence approximately one month before Randi's birth. While it is clear from the record that his crime was committed before Randi's birth, it is unclear whether the crime occurred prior to his being informed of the pregnancy. In any event, Albert's federal incarceration resulted in his inability to have any personal contact with Randi (and, presumably, his other child) from 2011 until his placement in a Council Bluffs halfway house in 2016.

In *In re Interest of Athina M., supra*, we reversed the decision of the juvenile court terminating the parental rights of an incarcerated father. In that case, the evidence demonstrated that the father was involved in a loving relationship with the child prior to his incarceration, and actually had placement of the child for one month prior to his arrest. Although the father was awaiting sentencing at the time of the termination hearing, it was unknown whether he might have received probation or time-served. The sentencing hearing was scheduled two weeks following the termination hearing; the DHHS worker involved testified that if the father were released, reevaluation of the termination would be in order.

This case presents several contrasts to *In re Interest of Athina M*. First, there has been no relationship established between Albert and Randi. While it cannot be stated that Albert committed his offense knowing that he had a child on the way, it is also clear that he did not commit the offense involuntarily. While it is likely that he was aware he had another child at the time of the offense, we do not know the age of that child. Second, Albert took little initiative to accelerate the process of establishing paternity. He knew he was potentially the father at the time of birth, but did nothing affirmatively until May 2015. Even after being provided paperwork and being informed of the potential for adoption, he did nothing until he signed the notice of objection to the adoption in October 2015. He then again refrained from communicating with Lewis until late June 2016. Third, Albert did little, if anything, to support Randi or establish a relationship with her. During his incarceration, he sent one card to Randi's biological mother on her first birthday. No other gifts or support was provided. The evidence also demonstrates that Albert did not take any parenting classes during or after his incarceration. Once released, he failed to appear for the permanency mediation session. His only stated request during the termination hearing was for visitation. Given his child's age, we would hope that even in prison, Albert would take some initiative to prepare himself for parenthood. Incarceration cannot be used as a shield to prevent an assessment of whether a parent is fit. Here, Albert's inactivity and lack of diligence has served to lengthen his daughter's time "suspended in foster care." Based on the totality of these factors, we cannot say the juvenile court's finding that Albert is an unfit parent constitutes error.

To a significant degree, Albert has been a parent "unable" to rehabilitate himself within a reasonable time. However, he is also a parent who has been "unwilling" to do so within the parameters available to him. This opinion should not be read to be a departure from established law that incarceration alone cannot serve as a basis for termination of parental rights. However, we must examine pursuant to the best interests of the child, what efforts the parent has made while incarcerated to establish or maintain a parent-child relationship within the parameters that are available to them.

It is clear from the record that terminating Albert's parental rights would be in Randi's best interest. She cannot languish in foster care, uncertain about her future for years, potentially,

because a man she has never met has stated that he wants visitation with her. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *Jahon, supra.*

## CONCLUSION

Upon our de novo review of the record, we find that the State presented sufficient evidence to warrant termination of Albert's parental rights to Randi. As such, we affirm the order of the juvenile court terminating his parental rights to the minor child.

AFFIRMED.