IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF BROOKLYN W. & RYAN W.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF BROOKLYN W. AND RYAN W.,
CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ANGELA T., APPELLANT, AND MICKIE W., APPELLEE.

Filed February 16, 2021.    No. A-20-572.

Appeal from the County Court for Cass County: LAWRENCE D. GENDLER, Judge. Affirmed.

Bobie A. Touchstone, of Touchstone Law Office, for appellant.

Sarah M. Sutter, Cass County Attorney, for appellee State of Nebraska.

PIRTLE, Chief Judge, and MOORE and ARTERBURN, Judges.

ARTERBURN, Judge.

## INTRODUCTION

Angela T. appeals from the order entered by the Cass County Court, sitting as a juvenile court, which terminated her parental rights to two of her minor children, Brooklyn W. and Ryan W. Based on the reasons that follow, we affirm.

## BACKGROUND

### PROCEDURAL BACKGROUND

Brooklyn, born in July 2012, and Ryan, born in May 2015, are the biological children of Angela and Mickie W. Although Mickie's parental rights to Brooklyn and Ryan were terminated at the same time that Angela's parental rights were terminated, he has not appealed from the

- 1 -

termination of his parental rights. As such, Mickie is not a party to this appeal and his involvement in the case will be discussed only to the extent necessary to provide context.

The juvenile court proceedings were initiated in April 2017 after the Department of Health and Human Services (Department) received a report that Angela was using methamphetamine while caring for Brooklyn and Ryan and that she had been stealing in order to obtain money to buy the drugs. At the time of this report, Angela was on probation after having been convicted of conspiracy to distribute methamphetamine in federal court. Mickie was incarcerated in federal prison after being convicted of multiple offenses.

On April 4, 2017, law enforcement and a Department caseworker visited Angela's home. The home was described as being "below minimal standards," as it was very messy, posed a danger to the children, and stored a great deal of stolen property. Angela agreed to submit to a drug test, which revealed the presence of methamphetamine in her system. While Angela initially denied using any drugs, she ultimately admitted to smoking methamphetamine the prior weekend while celebrating her birthday. Angela refused to consent to a search of her residence for illegal drugs. That day, Brooklyn and Ryan were removed from Angela's home and placed in the temporary custody of the Department in a foster home.

On April 5, 2017, the State filed a petition alleging that Brooklyn and Ryan were within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) due to the faults or habits of Angela. That same day, the State also filed a motion for ex parte custody of the children, which was granted by the county court. The children were to remain in an out-of-home placement until a further hearing could be held.

An initial hearing was held one week later on April 12, 2017. At the hearing, Angela denied the allegations contained in the petition. However, she did not contest the children's out-of-home placement. The county court noted that Angela had agreed to submit to a chemical dependency evaluation and was receiving supervised visitation with the children in addition to family support and drug testing.

At a subsequent hearing held on June 21, 2017, Angela admitted to the allegations contained in the petition. As a result of her admissions, Brooklyn and Ryan were adjudicated as children within the meaning of § 43-247(3)(a). They remained in their foster care placement. By the time of this hearing, Angela had been arrested and was being housed in the Cass County jail. As such, the Department was limited in the services they could provide to Angela to assist her with reunification. However, at a disposition hearing held in August 2017, the county court adopted the recommendations of the Department to require Angela to obtain safe and stable housing upon her release from jail and to maintain a sober lifestyle. Angela was permitted visitation with the children every other week at the jail.

A review hearing was held in May 2018. By the time of this hearing, Angela had been released from the county jail and was residing at a residential treatment center. However, she was awaiting sentencing after having pled guilty to possession with intent to distribute methamphetamine in federal court. The county court ordered Angela to complete her treatment and follow all recommendations upon her discharge; to maintain employment; to obtain safe and stable housing; to complete a parenting class; and to maintain a sober lifestyle. Angela was permitted supervised visits with Brooklyn and Ryan two times per week.

On October 30, 2018, the State filed a motion to terminate both Angela's and Mickie's parental rights to Brooklyn and Ryan. As to Angela, the motion alleged that termination was appropriate pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016). The State also alleged that termination of Angela's parental rights was in Brooklyn's and Ryan's best interests. While the motion for termination for parental rights was pending, Mickie, who had recently been released from prison, was actively cooperating with the Department to obtain reunification with Brooklyn and Ryan. Due to Mickie's efforts, the Department and the State developed a plan to transition the children to Mickie's home in December 2019. The State withdrew the motion to terminate both parents' rights.

In December 2019, Brooklyn and Ryan left the foster home placement they had been living in since April 2017, and moved to Mickie's home. However, the children were removed from Mickie's home approximately 1 month later, on January 24, 2020, due to Mickie having been arrested for possession of methamphetamine. The children were placed in a different foster home.

On January 30, 2020, the State filed a second motion to terminate both Angela's and Mickie's parental rights to Brooklyn and Ryan. By the time of this filing, Angela was housed in a federal prison in Illinois, having surrendered herself for her prison sentence in June 2019. The motion for termination of Angela's parental rights again alleged that termination was appropriate pursuant to § 43-292(2), (6), and (7), and that termination was in the children's best interests. While the motion for termination of parental rights was pending, Angela filed a motion requesting telephonic visitation with the children. The county court entered an order permitting Angela to have telephonic visitation with the children from prison one time per week.

A hearing on the motion to terminate parental rights began on June 24, 2020, and continued on various dates in June and July.

EVIDENCE PRESENTED AT TERMINATION HEARING

At the termination hearing, the State called the child and family service specialists who had been assigned to assist Angela and the children throughout the duration of the proceedings. Wendy Stevenson was the Department caseworker who assisted with removing Brooklyn and Ryan from Angela's home in April 2017. She then managed the family's case through May. Stevenson testified that from the date of the children's removal on April 4 through the end of May, Angela was "pretty cooperative with everything." Stevenson explained that Angela participated in almost daily supervised visitation with the children and with family support services. She also submitted to drug testing. However, Angela tested positive for methamphetamine on more than one occasion during this time period. In addition, shortly after the children's removal from Angela's home, hair follicle testing was completed on each of them. Brooklyn and Ryan both tested positive for amphetamine and methamphetamine. Stevenson explained that each child must have been exposed to the drugs during the last 90 days, when they were in the care and custody of Angela.

Molly Cunningham took over the family's case shortly after Stevenson's initial work ended. She then worked with Angela and the children through November 2018. Cunningham indicated that when she took over the case, Angela was being held in the Cass County jail as a result of violating the tenets of her federal probation and as a result of a new charge of theft by shoplifting (over $5,000) having been filed against her. Cunningham explained that Angela's incarceration made it very difficult for her to communicate with Angela and for the Department to

set up services to assist Angela with reunification of the children. Despite these barriers, Cunningham met with Angela at the jail one time per month. In addition, Cunningham set up visitation between Angela and the children to occur every other week. During these visits, Angela remained behind a glass partition. Cunningham testified that Angela was cooperative with the Department during her time in jail.

Angela was released from the Cass County jail in February 2018, and immediately entered a residential substance abuse treatment facility. Cunningham testified that Angela paid for the treatment facility herself. However, other evidence presented at the hearing revealed that entering the treatment facility was a condition of Angela's release from jail for her federal probation violation. Another condition of her release was that she pay for the treatment on her own.

Cunningham testified that while Angela was at the treatment facility, she had supervised visitation with the children two times per week. While the visits could have taken place at the treatment center, Angela often chose to take the children to parks, restaurants, and other locations in the community. Cunningham explained that, during her time on the case, Angela never progressed beyond fully supervised visitation with the children, in part, because Angela often engaged in inappropriate conversations with the children, including making promises about their future as a family. Cunningham described Angela as giving the children "false hope," which ultimately caused the children to act out negatively in their foster home.

Cunningham testified that Angela did everything she asked her to do. Angela had employment and only missed a few visits with the children. In addition, during Angela's time at the treatment facility, she never tested positive for drugs. Cunningham did note that Angela did delay in signing a release so that the Department could more easily coordinate with her federal probation officer. Cunningham also expressed some concerns regarding Angela's pending federal charge and possible sentence. Cunningham did not believe that Angela was realistic or honest about her possible sentence, especially when she was discussing the future with the children.

Kathleen Dvorss took over the case work for the family beginning in March 2019. She was assigned to the case through September. By March 2019, Angela had been successfully discharged from the residential treatment facility and was residing in her own home. Angela was permitted to have one supervised visit with the children per week. The visit was held at Angela's home on Saturdays from 10 in the morning to 3 in the afternoon. Dvorss indicated that the visits never progressed beyond fully supervised, in part, because of Angela's pending federal prison sentence, and, in part, because of concerns about Angela's discipline of the children during visits and her inappropriate conversations with the children. Dvorss described that Angela continued to tell the children that they were going to be a family again soon. These discussions caused the children to exhibit behavioral problems in their foster home.

From March to June 2019, Angela was employed at a local fast food restaurant. She regularly tested negative for illegal substances. In June 2019, Angela was incarcerated in a federal prison in Illinois as a result of her guilty plea to possession with intent to distribute methamphetamine. After her incarceration, Angela occasionally spoke with her children during their visits with Mickie. Otherwise, she did not have contact with the children.

Trisha Babbel took over the case work for the family in October 2019. She was the current caseworker assigned to the case at the time of the termination hearing in June and July 2020. In October 2019, Angela remained incarcerated at a federal prison in Illinois. Babbel testified that

according to the prison's website, Angela will not be released from prison until January 12, 2022. Babbel indicated that Angela has expressed her belief that she will be released sooner than January 2022, but Angela has not provided anything to confirm her belief.

Babbel explained that as a result of Angela's incarceration, she cannot offer her any services beyond telephonic visitation with the children. At the time of the termination hearing, Angela was speaking with the children one time per week. Angela reported to Babbel that she was participating in an intensive drug program through the prison.

Babbel testified that Brooklyn and Ryan had been in an out-of-home placement for 38 of the last 39 months. For much of that time, approximately 33 months, the children were placed in a single foster home. However, they were removed from that foster home in December 2019, in order to be placed with Mickie. As we discussed above, the children's placement with Mickie lasted only one month. The children were then placed with their maternal aunt and uncle. After two months, though, their aunt and uncle informed the Department that they were not prepared to deal with the children's behaviors, in particular with Ryan's outbursts after speaking with Angela on the telephone. The children were briefly moved to a temporary foster home until another placement was found. The children have been in their current foster home since April 2020.

Babbel opined that termination of Angela's parental rights is in the best interests of Brooklyn and Ryan. Babbel did not believe that Angela had taken substantial steps toward reunification with the children since their removal in April 2017. In particular, Babbel noted that she did not have any information about Angela's ability to maintain in the long-term a safe and stable household and her sobriety, because Angela had been in and out of jail, a treatment center, and prison, throughout the life of the juvenile court proceedings. Babbel explained that when Angela was released from prison, the Department would essentially have to "start over" with providing her updated services and with assessing her abilities to parent the children. She opined that it may take at least 1 year after Angela's release for any sort of reunification to be possible. Given the situation, Babbel testified that the children would remain in foster care for at least 6 years, awaiting Angela's return to their lives. Babbel believed the children remaining in foster care for that long was, "a travesty."

The children have seen multiple mental health practitioners throughout the juvenile court proceedings. The State called three such witnesses to testify during the termination hearing. Colleen Cusick-Brown was Brooklyn's therapist from February 2018 through July 2019. Prior to Cusick-Brown seeing Brooklyn, she had been diagnosed as suffering from adjustment disorder with disturbance of emotions and conduct. Over the course of Cusick-Brown's 26 sessions with Brooklyn, Brooklyn made some improvements in maturing and developing better coping skills and had some periods of stabilization. Cusick-Brown attributed much of Brooklyn's improvement to her longevity in her initial foster home. However, Brooklyn consistently demonstrated feeling conflicted by feelings of loyalty toward Angela. Brooklyn reported looking forward to seeing Angela during visits, but also worried about Angela a lot. When Brooklyn was told that Angela was returning to prison in June 2019, Brooklyn said, "I just need a family that's going to do things right." Cusick-Brown opined that another removal from a parental home would be very disruptive, traumatic, and painful for Brooklyn.

Dr. Michael Coutts is a psychologist who treated Ryan beginning in December 2017 and ending in July 2019. In December 2017, Ryan's foster parents reported he was having "disruptive

behaviors," including difficulty with compliance, severe tantrums, and separation anxiety. Coutts diagnosed 2-year-old Ryan as suffering from adjustment disorder with mixed disturbance of emotions and conduct. Throughout Ryan's sessions with Coutts, his behavioral problems improved. Coutts believed that much of this improvement was attributable to the consistency and stability provided by his foster parents. Coutts explained that "consistency, predictability, and stability allow for a lot more behavioral, social, and emotional, and academic growth." Despite Ryan's improvements, his foster mother continued to report a regression in Ryan's behavior immediately following visitation or contact with Angela.

Angela Gadeken began treating both Brooklyn and Ryan in April 2020 and continued treating them at the time of the termination hearing. Similar to her previous providers, Gadeken diagnosed Brooklyn as suffering from an adjustment disorder with anxiety. Gadeken indicated that Brooklyn engages in excessive worrying and has pervasive sadness. Gadeken also diagnosed Ryan as suffering from an adjustment disorder with mixed disturbance of emotion. She indicated that Ryan experiences anxiety and depression. He also continues to act out negatively after participating in telephone calls with Angela. He hits, kicks, and avoids talking to anyone.

The State also called the children's most recent foster mother, Melissa Krueger, to testify. The children have resided with the Kruegers since April 17, 2020. Melissa described Brooklyn as initially wanting to control things, especially things involving Ryan. In the months prior to the termination hearing, however, Brooklyn has shown improvements. She loves to help Melissa with chores around the house and wants to be involved with everything the family does. In addition, she likes to laugh. Melissa described Ryan as initially having outbursts or "melt downs" every day. He would allow Brooklyn to speak for him. Ryan's behaviors have also improved over the last few months.

Melissa facilitates the children's telephone calls with Angela every Friday afternoon. Brooklyn struggles on the calls, becoming noticeably nervous as the time for the calls approaches and often not speaking very much during the calls without being prompted by Melissa. In addition, Brooklyn says that the calls make her sad. She often cries after the calls are over. Brooklyn reports that, in particular, she does not like when Angela makes promises about the future. Melissa described Ryan as also becoming nervous as the time for the calls approach. In addition, sometime shortly after the calls, Ryan has a "melt down" or a tantrum. Melissa noted that by the time of the trial, the only time Ryan has an outburst like this is after a telephone call with Angela.

After the State rested, Angela testified in her own defense. During her testimony, Angela detailed her criminal history and the time she had spent incarcerated. In 2008, Angela was convicted of conspiracy to distribute methamphetamine. She was, as a result, incarcerated in federal prison. She was released from prison in February 2011, but remained on probation. In fact, Angela was still on probation in April 2017 when her children were removed from her care as a result of her methamphetamine use. Angela admitted to having smoked methamphetamine in the home she shared with the children, but she denied smoking it when they were in the room with her.

Shortly after the children's removal, Angela was arrested and housed in the Cass County jail as a result of violating the terms of her probation. While she was in jail, she also pled guilty to attempted theft by unlawful taking ($1,500 to $5,000), a Class IV felony. She served her sentence

for this offense while being held for her probation violation. Angela admitted that she committed the theft offense while she was still on probation.

In April 2019, Angela pled guilty to possession with intent to deliver methamphetamine in federal court. This offense was, apparently, committed on May 25, 2017, after the children's removal from her care. As a result of this conviction, Angela was sentenced to 60 months' imprisonment and, upon her release, to 4 years of supervised probation. Angela began her sentence in June 2019. An Individualized Reentry Plan from the Federal Bureau of Prisons which was offered by Angela at the termination hearing indicates that Angela's projected release date is January 12, 2022. However, Angela disputed this projection during her testimony. Angela testified as to her belief that she will actually be released in December 2020 or January 2021 as a result of certain reductions made to her sentence. She did admit, however, that she was not yet able to provide a certain date for her release.

Despite her criminal history, Angela testified that she had made vast improvements in her life during the pendency of the juvenile court proceedings. She pointed to her voluntary admittance to an inpatient rehabilitation center after her February 2018 release from jail. However, Angela did later explain that admittance to inpatient treatment was a condition for her release from jail. Angela testified that she was successfully discharged from inpatient treatment after 11 months. Moreover, despite regular testing, she did not have any positive drug tests after May 2017.

While Angela was still residing at the residential treatment center, she obtained employment at a local fast food restaurant. She started working as a "crew member," but was ultimately promoted to be a general manager of one location. Angela indicated that she worked at that job up until the time she began her prison sentence in June 2019. She also indicated that she intends to return to that employment upon her release from prison.

After leaving the residential treatment center, Angela secured an apartment and paid $1,000 a month in rent from February 2019 through June 2019. She was even able to secure a vehicle for transportation.

Since becoming imprisoned in June 2019, Angela testified that she has participated in multiple programs offered by the prison, including a 6-month nonresidential treatment program and now, a residential treatment program. While Angela discussed how much the residential treatment program in prison has helped her, she also conceded that this is the second time she participated in the program. During her first federal incarceration, she completed this same program, but ultimately relapsed after her release.

Angela testified about her continuous participation in visitation with her children, despite her circumstances. While she was in the Cass County jail, she had visits with the children every other week, even though those visits had to take place through glass. When she was residing at the inpatient treatment center, she had weekly visits with the children. During these visits, she and the children would visit parks, museums, movie theaters, and splash pads. After her release from inpatient treatment, she continued to have visitation with the children one time per week at her home. Angela testified that she asked to have more visits with the children, but her request was not granted. Angela explained that in the months prior to her return to prison, "Every visit meant the world to me." She conceded that her visits never moved beyond fully supervised.

Once her incarceration began in June 2019, she was able to speak with the children when Mickie would spend time with them, as he would facilitate telephone calls. In addition, Mickie

drove the children to see Angela at the federal prison on Christmas day in 2019. This in-person visit was not authorized by the Department. After the children were removed from Mickie's care, the Department established weekly telephone calls between the children and Angela which occur on Friday afternoons. Angela testified that both Brooklyn and Ryan are always very eager to talk to her during these calls. She explained that Brooklyn will sometimes act shy during the calls because of the presence of her foster mother. Angela admitted that she continues to discuss the future with the children because she believes they will be a family again soon. She testified that she has a "wonderful" relationship with the children.

During the State's cross-examination of Angela, she indicated that she has two older children, one of whom remains a minor. Angela explained that her other minor child is in the custody of his father. She has not seen this child since before she was incarcerated in federal prison the first time, when he was approximately 4 years old. Angela last spoke to this child a few years prior to the termination hearing. In fact, she indicated that Brooklyn and Ryan know nothing about her other minor child. She blamed her lack of relationship with the child on the child's father.

Angela testified that her parental rights to Brooklyn and Ryan should not be terminated because she had done everything asked of her by the county court and the Department. She indicated that she felt remorse for everything she had put her children through, but that she had worked hard to change her life and fix her mistakes. Angela expressed a strong desire to be a parent for Brooklyn and Ryan.

In addition to her own testimony, Angela offered the testimony of her boss and one of her employees from the fast food restaurant where she was employed prior to becoming incarcerated in June 2019. In addition, she offered the testimony of a friend she had met during her previous time in federal prison.

Reggie Evans testified that he was Angela's boss at the fast food restaurant. He described how she started at an entry level position and was eventually promoted to be general manager of a location, working more than 50 hours per week. He believed Angela to be an "excellent" employee and indicated his intention to re-hire her when she is released from prison. Evans testified that Angela never missed work and never received any disciplinary action.

Katerra Carroll was one of Angela's employees when she was general manager of the restaurant. Carroll described Angela as a good boss who was thorough, hands-on, and hard working. Carroll also indicated that Angela spoke of Brooklyn and Ryan a lot when they worked together.

Becky Hass Specht met Angela in 2008 when they were incarcerated together. Specht indicated that she has served as a support system for Angela and will continue to do so upon Angela's release from prison. Specht has mailed birthday presents to the children from Angela while she has been incarcerated.

JUVENILE COURT'S ORDER

On July 16, 2020, the county court entered a lengthy order terminating Angela's parental rights to Brooklyn and Ryan. The court found that the State had proven that termination of Angela's parental rights was warranted pursuant to § 43-292(2), (6), and (7), and that termination was in the children's best interests. In reaching its findings, the court summarized the evidence presented at the termination hearing as follows:

Without question, [Angela] has achieved at a high level over part of the last 39 months. However her actions, and particularly the commission of the most recent felony which ironically was not drug related and again removed her from the children's lives, is equally sad, inexcusable, and most troubling. Whether [Angela] is released from confinement in 60 days, 6 months, or a year does nothing for the needs of the children now.

The court explained the children's immediate need for permanency:
The children have been in out of home care for 38 months, in the system for 39 months, assigned to multiple therapists, moved 5 times, and throughout the entire time have yearned for a parent willing to accept them and care for them. They suffer from significant psychiatric adverse effects and enormous needs because of the uncertainty forced upon them by two parents who have ignored their children in favor of methamphetamine and criminal behaviors.

Angela appeals from the county court's order which terminated her parental rights to Brooklyn and Ryan.

## ASSIGNMENT OF ERROR

On appeal, Angela alleges that the county court erred in finding that there was sufficient evidence to prove that termination of her parental rights is in the children's best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

## ANALYSIS

### STATUTORY FACTORS

In the Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

In its order terminating Angela's parental rights to Brooklyn and Ryan, the county court found that termination was warranted pursuant to § 43-292(2) because Angela had substantially and continuously or repeatedly neglected and refused to give the children necessary parental care and protection; § 43-292(6) because reasonable efforts to preserve and reunify the family failed to correct the conditions leading to the determination that the children were within the meaning of § 43-247(3)(a); and § 43-292(7) because the children had been in an out-of-home placement for 15 or more months of the most recent 22 months. On appeal, Angela does not specifically challenge the county court's findings with regard to the statutory bases to support termination of her parental rights.

Despite Angela's failure to challenge the statutory bases to support termination, having reviewed the record, we find there was sufficient evidence presented to support the county court's decision that termination of Angela's parental rights was warranted pursuant to § 43-292(7). The record reveals that Brooklyn and Ryan were removed from Angela's care and custody in April 2017. With the exception of a one month period when they were placed with Mickie, the children have remained in an out-of-home placement since April 2017. As such, at the time the motion requesting termination of Angela's parental rights was filed in January 2020, the children had been in an out-of-home placement for approximately 32 months. Moreover, by the time of the termination hearing in June 2020, the children had been in an out-of-home placement for approximately 37 months, or just over 3 years.

Our de novo review of the record clearly and convincingly shows that grounds for termination of Angela's parental rights under § 43-292(7) were proved by sufficient evidence. Given this finding, we need not discuss the evidence presented at the termination hearing which supported the county court's determination that termination of Angela's parental rights was also warranted pursuant to § 43-292(2) or (6).

BEST INTERESTS

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J., supra*. A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016). This presumption is overcome only when the State has proved that the parent is unfit. *Id*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Id*. The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*.

On appeal, Angela challenges the county court's finding that termination of her parental rights is in the children's best interests. Specifically, Angela asserts that the evidence presented at the termination hearing revealed that she has a strong bond and a beneficial relationship with her children. She argues that separating the children from her is not in their best interests. Angela also asserts that the evidence revealed that she complied with all of the tenets of her rehabilitation plan and that, as a result of this compliance, it would not be in the children's best interests to terminate her parental rights at this point in time. Upon our de novo review of the record, we find sufficient evidence to support the county court's determination that termination of Angela's parental rights is in the children's best interests. As such, we affirm the order of the county court terminating Angela's parental rights to Brooklyn and Ryan.

We agree with Angela that during a portion of the juvenile court proceedings, she accomplished everything asked of her. After being released from jail and entering residential treatment in February 2018, Angela remained drug free; obtained employment and excelled there; obtained independent and stable housing after leaving residential treatment in January 2019; and even purchased a vehicle for transportation. Angela also attended visitation with the children every

Saturday. Unfortunately, Angela's significant efforts from February 2018 through her return to federal prison in June 2019, have to be viewed in conjunction with her actions prior to that time.

The record reveals that Angela has either been in federal prison, county jail, or under the supervision of federal probation since her first federal conviction in 2008. At the time of the children's removal in April 2017, Angela remained on federal probation. However, at that time she was engaging in multiple criminal actions which ultimately led to the removal of Brooklyn and Ryan from her care. Angela admitted to using methamphetamine. She used the drug in the same house with the children, such that both Brooklyn and Ryan tested positive for methamphetamines at the time of their removal. Angela was also involved in a shoplifting scheme which resulted in a felony theft conviction. Given her prior federal drug conviction and her status on probation, Angela had to know the serious consequences of her actions, particularly as it related to her young children.

Even after the children were removed from Angela's care, she continued to use methamphetamine, testing positive on multiple occasions from April through May 2017. Additionally, the evidence suggests that Angela was also selling methamphetamine, as she pled guilty to possession with intent to distribute methamphetamine in April 2019. Court documents indicate that this offense occurred in May 2017, after the children's removal. Again, given that Angela was on probation and given that her children had recently been removed from her home, she had to know the serious consequences of her ongoing actions.

As a result of Angela's criminal actions, she was incarcerated and unavailable to care for her children for 21 months of the 39 months this case was pending in the juvenile court. Angela remained incarcerated at the time of the termination hearing. While Angela believed she would be released in December 2020 or January 2021, documentary evidence from the Federal Bureau of Prisons indicated that her scheduled release date was not until January 12, 2022. If this date is correct, Angela will not be available to care for her children for at least an additional 19 months. Even if Angela's projected release date proved correct, the children would still have been living in a placement outside of her care for 45 months. Although incarceration alone cannot be the sole basis for terminating parental rights, it is a factor to be considered. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). And the Nebraska Supreme Court has previously noted that although incarceration itself may be involuntary as far as a parent is concerned, the criminal conduct causing the incarceration is voluntary. *Id*. Essentially, Angela's repeated criminal actions while she was on federal probation demonstrate voluntary conduct that prevented her from functioning as a fit and present parent for her children.

Angela's actions are especially concerning given that they now demonstrate a pattern of instability in her life. After Angela's first federal incarceration, she appears to have avoided criminal activity, at least in the short term. However, she returned to drug use and a criminal life style, despite the births of Brooklyn and Ryan in the interim. Angela's history of relapse provides context to her very recent efforts toward a sober and stable lifestyle. Because Angela was either in treatment, in jail, or in prison, for a vast majority of the duration of the juvenile court proceedings, there is a very real concern that when Angela is released from prison, she may, ultimately, relapse again. As a result of this concern, even after Angela's release, it would be some time before she could be reunited with the children, which would further their time in foster care.

The record reveals that Brooklyn and Ryan desperately need permanence in their lives. After more than 3 years in foster care, the children continue to demonstrate feelings of anxiety, depression, guilt, and confusion regarding their relationship with Angela. Four-year-old Ryan continues to have significant outbursts and tantrums after having short telephone calls with Angela. Brooklyn cries after the calls and constantly reports worrying about Angela. The children's therapists testified that the children thrive when there is some sort of routine and security in their day to day lives. They cannot achieve this without having a sense of permanence in their living situation. Given Angela's current incarceration and her history of relapse, Angela is simply not capable of providing the children with the permanence they need. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d 55 (2008).

Furthermore, we note that we question Angela's assertion that she has a positive and beneficial relationship with the children. As Angela herself testified, the children were removed from her care when Brooklyn was almost 5 years old and Ryan was not quite 2 years old. At the time of the conclusion of the termination hearing, Brooklyn was 8 years old and Ryan was 5 years old. During the 39 months the juvenile court proceedings were pending, Brooklyn and Ryan saw their mother, at most, one or two times per week. At the beginning of the case, this time was spent with a glass partition separating them from Angela. At the end of the case, visitations were had over half hour telephone calls. Angela's visits with the children have always been supervised. The limited amount of time Angela spent with the children during the course of this case has certainly had an impact on her relationship with the children. She has not been a part of their daily lives for years. She has simply not been available to act as a parent to them. Moreover, the record indicates that the children often have negative reactions either before, during, or after spending time with Angela.

Given the length of time this case has been pending and given Angela's continuing inability to act as a parent to the children as a result of her incarceration, we do not find that the county court abused its discretion in finding that termination of Angela's parental rights is in the children's best interests. Angela is currently not fit to parent Brooklyn and Ryan as a result of her numerous past criminal actions and the lingering consequences of those actions. While Angela may be released from her current period of incarceration in the next few months, she will not be in a position to immediately achieve reunification with the children. Instead, she will need to demonstrate a long-term ability to maintain a sober and stable lifestyle, something that she has not done since her first federal conviction in 2008. The children need consistency and permanency now. As Brooklyn told her therapist, "I just need a family that's going to do things right." We affirm the order of the county court which found that termination of Angela's parental rights was in the best interests of Brooklyn and Ryan.

CONCLUSION

Upon our de novo review of the record, we find that there was sufficient evidence presented to warrant the termination of Angela's parental rights to Brooklyn and Ryan. As such, the order of the county court is affirmed.

AFFIRMED.