IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF MICHAEL L.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF MICHAEL L., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

BERNARD P., APPELLANT.

Filed February 8, 2022.    No. A-21-539.

Appeal from the Separate Juvenile Court of Douglas County: CANDICE J. NOVAK, Judge. Affirmed.

Mark F. Jacobs, of Bressman, Hoffman & Jacobs, P.C., L.L.O., for appellant.

Cara Stirts, Deputy Douglas County Attorney, and Traemon Anderson, Senior Certified Law Student, for appellee.

MOORE, ARTERBURN, and WELCH, Judges.

ARTERBURN, Judge.

## I. INTRODUCTION

Bernard P. appeals from an order of the separate juvenile court of Douglas County, which terminated his parental rights to his son, Michael L. Upon our de novo review of the record, we affirm the juvenile court's order.

- 1 -

## II. BACKGROUND

### 1. PROCEDURAL BACKGROUND

Bernard is the biological father of Michael, born in April 2017. Michael's biological mother is Crystal L. Crystal's parental rights to Michael were terminated in May 2019, and we only discuss Crystal as necessary to the resolution of the current appeal by Michael.

Michael was removed from Crystal's care immediately after his birth in April 2017, because Crystal tested positive for cocaine and amphetamines and because Crystal had previously been involved with the juvenile court regarding her older children. The State filed a petition alleging that Michael was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) as to Crystal. The State also filed an ex parte motion requesting that Michael be placed in the immediate custody of the Department of Health and Human Services (Department). Upon his release from the hospital, Michael was placed in a foster home. He has remained in foster care since that time.

In June 2017, approximately 2 months after the State filed the petition regarding Crystal, Bernard submitted to DNA testing to prove he was Michael's biological father. At that time, Bernard was involved in a relationship with Crystal and resided in Crystal's home. The DNA testing revealed that Bernard was, in fact, Michael's biological father.

Despite being established as Michael's biological father, Bernard was not immediately made a party to the juvenile court proceedings. And, while Bernard was permitted to attend family team meetings, he was not permitted to have any parenting time with Michael until he established himself as Michael's "legal" father. The family's caseworker at that time encouraged Bernard to take steps to formally establish his paternity, so as to become Michael's legal father. However, Bernard did not take immediate action and his paternity was not formally established until October 2018, 18 months after Michael's birth, when an order of paternity and support was entered by the district court.

Bernard was first permitted to attend Crystal's parenting time with Michael in November 2018. Around the time of Bernard's first visit with Michael, the State filed a supplemental petition alleging that Michael was a child within the meaning of § 43-247(3)(a) as to Bernard. Specifically, the supplemental petition alleged that Michael was at risk for harm because Bernard continued to reside with Crystal, who was not following through with the tenets of the rehabilitation plan designed to help her achieve reunification with Michael. The supplemental petition also alleged that Bernard was unable to provide support or safe and stable housing for Michael.

On December 14, 2018, less than 1 month after filing the supplemental petition, the State filed an amended supplemental petition and a motion to terminate parental rights as to Bernard. The amended supplemental petition again alleged that Michael was at risk for harm because Bernard continued to reside with Crystal and because Bernard was unable to provide Michael with proper support or safe and stable housing. The motion to terminate Bernard's parental rights alleged that termination was appropriate pursuant to Neb. Rev. Stat. § 43-292(2) and (7) (Reissue 2016). The motion also alleged that termination was in Michael's best interests. A motion to terminate Crystal's parental rights was also filed.

A termination trial was held over 2 days in February and March 2019. In an order entered on May 9, 2019, the juvenile court terminated Crystal's parental rights to Michael. However, in a

separate order entered that same day, the juvenile court declined to terminate Bernard's parental rights to Michael. The court noted that despite proving he was the biological father of Michael, Bernard was "inexplicably" denied any visitation with Michael for approximately 17 months until he established himself as the legal father. The court did place some of the blame of the delay with Bernard, finding, "It is clear that the father, for seventeen months after becoming aware that he was the biological father of the minor child, failed to take measures to involve himself with his son's case." The court ultimately concluded as follows:

> It is the Court's determination that this father must be accorded an opportunity to participate with a reunification plan, and to demonstrate that he is able to parent this very young child, and that he can and will do so independent of Crystal [], whose parental rights are terminated this date by concurrent Order of the Court.

In the May 2019 order, the juvenile court did adjudicate Michael as a child within the meaning of § 43-247(3)(a) as to Bernard. The court then ordered Bernard to participate with a rehabilitation plan designed to reunify him with Michael. The tenets of such plan included participating with an initial diagnostic interview, submitting to random drug and alcohol testing, maintaining safe and appropriate housing, completing a parenting class, maintaining a stable and legal source of income, and participating in supervised visitations with Michael. We note that by the time the juvenile court entered the May 2019 adjudication and dispositional order, Bernard was incarcerated after his probation was revoked due to him violating the conditions of that probation. According to Bernard, he had been on probation for felony driving under revocation. He was sentenced to a period of 18 months in jail.

As a result of Bernard's incarceration, he could not adhere to many of the tenets of his rehabilitation plan. He was, initially, afforded the opportunity to have visits with Michael at the correctional facility. However, on the day of his first scheduled visit with Michael in October 2019, 2-year old Michael would not cooperate with getting in the visitation worker's vehicle in order to travel from Omaha to Lincoln where Bernard was incarcerated. According to Michael's foster mother, Loretta Wells, on the morning of the scheduled October 2019 visit:

> [she] tried to put [Michael] in the car seat, and he was stiff, crying, kicking. And [the visitation worker] called her supervisor and didn't feel comfortable with taking him. He was kicking the back of the seat. We did have him in the car in the car seat, he was kicking the back of the seat. She called her supervisor . . . and she said don't force him to go.

Wells indicated that she had never seen Michael behave like this prior to the morning of the October 2019 visit. After this incident, Michael's court-appointed guardian ad litem filed a motion to suspend Bernard's visitation while he remained incarcerated. The district court declined to suspend Bernard's visits entirely. However, the court indicated that Bernard was only permitted to have supervised visits with Michael when he was able to travel to Omaha on a scheduled furlough.

Ultimately, Bernard was able to visit with Michael in Omaha one time per month in the months of January, February, and March 2020. Bernard was then unable to visit with Michael from April until his release from incarceration in September 2020, due to restrictions established by his correctional facility as a result of the COVID-19 pandemic.

During his incarceration, Bernard was able to complete a parenting class and an outpatient treatment program for drug and alcohol abuse. He participated in a work release program and was employed as a brick layer. As a part of this employment, he submitted to two drug tests, one in May 2020 and one in September 2020. Each test was negative for the presence of alcohol. During his incarceration, Bernard also regularly wrote letters to Michael and arranged for Michael to receive birthday and holiday gifts.

Prior to Bernard's release from incarceration, the State filed a second motion for termination of his parental rights in April 2020. Such motion alleged that termination was appropriate pursuant to § 43-292(1), (2), (6), (7), and (9). The motion also alleged that termination was in Michael's best interests.

Bernard was released from incarceration on September 28, 2020. The State filed a motion seeking a 4-month continuance of the termination proceedings in order to give Bernard "an opportunity to reunify with his son." The court granted the request for a continuance. However, during the 4-month continuance, the court supplemented Bernard's rehabilitation plan to provide that, in addition to the orders delineated in the May 2019 order, Bernard needed to comply with the tenets of his parole and be assessed for the appropriateness of child-parent psychotherapy services.

2. TERMINATION TRIAL

The trial on the State's second motion for termination of Bernard's parental rights began on January 27, 2021. On this first day of trial, the State called four witnesses to testify, including Bernard.

Bernard testified that since his release from incarceration in September 2020, he had been living with his adult son and was employed full time. Bernard testified that he was having supervised visits with Michael three times per week. Each visit lasted 4 or 5 hours. During these visits, 3-year-old Michael and Bernard would color, play with toy cars, play with the dogs living at Michael's son's home, and play basketball. Bernard was unable to provide the names of Michael's doctor, teacher, or daycare.

In November 2020, Bernard participated in an initial diagnostic interview pursuant to the juvenile court's order. The results of this assessment revealed that Bernard suffered from an alcohol use disorder which was currently in sustained remission. Bernard admitted that alcohol had been his "drug of choice." During his lifetime, Bernard had been convicted of driving under the influence on four separate occasions.

At the time of his testimony in January 2021, Bernard remained on parole. Bernard admitted that he was no longer complying with urinalysis testing and that he was not attending any type of mental health therapy or AA meetings. He indicated that he had been sober since 2014 or 2015, but was unsure of his specific date of sobriety. He had attended outpatient treatment in July 2018 and during his incarceration, in February 2020. Bernard had not yet completed the assessment to determine if child parent psychotherapy would be beneficial, but indicated he had been unable to find a provider who was able to do such an assessment.

Testimony from Bernard's assigned drug tester confirmed his failure to comply with drug and alcohol testing. By the time of the termination trial on January 27, 2021, Bernard had not

complied with requests for urinalysis testing for 30 days. The last time he submitted to a test was December 22, 2020.

During the State's direct examination, Bernard was unable to explain why it had taken him so long to establish himself as Michael's legal father, when he had been told what steps he needed to take. Bernard blamed his caseworkers for many of the delays in the case and for his sporadic visitation with Michael early on. Bernard indicated that his current caseworker, Pearl Lackner, has never visited with him in person, even after his release from incarceration. He claimed to have only spoken with Lackner on the telephone on "a few" occasions.

Wells, Michael's foster mother, also testified on the first day of the termination hearing in January 2021. She had been Michael's foster parent for more than 2 years by the time of her testimony. Wells indicated that in September 2020, when Bernard was released from incarceration and began having more visits with Michael, Michael would resist attending the visits. Michael would cry before the visits and would try to hide from the visitation worker so he did not have to leave Wells' home. When Michael returned from visits with Bernard, Wells described him as acting "clingy" and tired. By the time of the trial, Wells believed that Michael's resistance to visits had lessened somewhat. However, she testified that Michael is not bothered by cancelled visits.

Jaclyn Rahaman also testified on the first day of the termination trial. She acted as Bernard's family support worker and visitation supervisor through January 2021. Rahaman testified that Bernard successfully completed a family support program in June 2020. Bernard was fairly consistent in attending visits with Michael from October through December 2020. However, Bernard had become less consistent in his attendance in January 2021. In fact, between January 1 and January 11, Bernard cancelled four out of six scheduled visits with Michael. Of the two visits he did attend during that time period, Bernard decided to end the visits early. Rahaman indicated that during visitations, there were no safety concerns nor any "major" concerns regarding Bernard's parenting skills. Rahaman recalled that Michael had referred to Bernard as "dada" during at least one visit.

The trial was continued until February 12, 2021. On this second day of trial, Bernard did not appear in court. His counsel indicated that he was not aware of why Bernard was not present. Counsel also indicated that he had tried contacting Bernard that morning, but had received no response. Counsel requested a continuance, but such request was denied by the juvenile court, as Bernard had been notified of the continued trial date at the close of the previous day of trial.

On the second day of the trial, the State called the current caseworker assigned to the family, Lackner, to testify. Lackner was assigned as the family's caseworker in October 2019, when Bernard was still incarcerated. She testified that as long as Bernard remained incarcerated, there was not much in the way of services she could offer to him, particularly during the COVID-19 pandemic. However, Lackner indicated that during Bernard's incarceration, she spoke with him over the telephone at least one time per month. In addition, she made efforts to arrange some visitation between Bernard and Michael. Unfortunately, due to issues with scheduling, with obtaining approvals from the corrections facility, and with Michael's resistance to visits, only a handful of visits were possible from October 2019 through the time of Bernard's release from incarceration in September 2020. In fact, no visits occurred for the last 6 months of Bernard's incarceration. The few visits that did occur were a result of Bernard using a furlough to travel to

Omaha to see Michael. Lackner indicated that during the supervised visits, there were no safety concerns or parenting issues reported.

Lackner confirmed that during his incarceration, Bernard was able to complete a parenting class and outpatient chemical dependency treatment, both programs which were offered to inmates. In addition, he sent letters to Michael on a regular basis and arranged for Michael to receive some holiday and birthday gifts. Bernard told Lackner that he had even started a college fund for Michael with some of his earnings from the work-release program.

Shortly after Bernard was released from his incarceration and placed on parole, a team meeting was held with him. At this meeting, Lackner informed Bernard that now was the time to be "completely compliant" with his court ordered rehabilitation plan, given the pending motion to terminate his parental rights and given that Michael had been in an out-of-home placement for well over 3 years. In particular, Lackner told Bernard that he needed to comply with the drug and alcohol testing and to fully participate in visitations with Michael.

Lackner testified that the juvenile court ordered Bernard to participate with urinalysis testing given his history of alcohol abuse. Bernard was to start such testing immediately upon his release from incarceration. For a few months, Bernard was compliant with requests for the urinalysis testing. And, his tests were negative for the presence of alcohol. However, toward the end of December 2020, Bernard stopped responding to requests for urinalysis testing. He did not test for a period of 30 days and was, as a result, terminated as a client by his service provider. Bernard never reached out to Lackner to request that a new service provider be found.

After Bernard's release from incarceration, he was permitted three visits with Michael per week. These visits continued to be fully supervised, because of the limited amount of time that Bernard was able to spend with Michael during his incarceration. Visitation workers reported no concerns with Bernard's parenting during visits. In fact, Bernard reached his "visitation goals" after only 1 month. Lackner did report that Michael continues to express resistance to attending visits with Bernard. Lackner was concerned that Michael's behavior indicated that Michael did not have a secure and positive attachment with Bernard.

While Bernard was initially fairly consistent in attending the visits, in January 2021, his attendance declined. Bernard cancelled his visits on January 2, 3, and 4. He attended visits on January 9 and 10, but ended each of those visits an hour early. On January 11, Bernard failed to call to confirm his visit, so the visit was again cancelled. Lackner believed that in the last few weeks prior to her testimony, Bernard had started attending visits more consistently again.

Lackner testified that after being released from incarceration, Bernard was not consistent in communicating with her. While Bernard had regularly communicated with Lackner using text messaging, in December 2020, he stopped responding to Lackner's messages. Lackner attempted to communicate with Bernard about his missed urinalysis tests, his housing situation, and his status, but Bernard did not respond to Lackner's efforts at communication.

While Bernard has reported to Lackner that he is employed, he has not provided any pay stubs to demonstrate a stable source of income. Upon Bernard's release from incarceration, he was residing with his adult son. However, in late December 2020, Bernard was apparently asked to leave his son's home. Lackner was unaware of Bernard's living situation after that, indicating he was living with an unknown friend. Lackner explained that within the last few weeks, Bernard

reached out to her to seek help with his housing situation, which she believed, suggested his current housing situation was unstable.

Lackner reported that Bernard completed an initial diagnostic interview in November 2020 and that such evaluation did not recommend any further treatment at that time. Bernard has not attended an initial interview for child-parent psychotherapy. However, the evidence revealed that there has been difficulties with finding an appropriate provider for this type of therapy. Lackner did not believe that Bernard could move from supervised visits until it was learned whether child-parent psychotherapy would be appropriate for Bernard and Michael.

Ultimately, Lackner opined that termination of Bernard's parental rights is in Michael's best interests. Lackner explained that Michael had been in an out-of-home placement for almost 4 years by the time of the second day of the termination trial. Despite the length of time that Michael had been out of the home, Bernard had demonstrated less than complete compliance and motivation toward reunification in the months leading up to the trial. Lackner believed that while Bernard had made some progress toward reunification, he was still struggling to demonstrate his ability to be a full-time parent for Michael. Additionally, Lackner was concerned about the weak attachment between Bernard and Michael. Finally, Lackner noted troubling issues from Bernard's history which were cause for concern. These included his history of criminal behavior, his delay in establishing a legal relationship with Michael, and his noncompliance with probation which resulted in his most recent prison term. These issues, particularly when considered with both his recent history of noncompliance in the 4 to 6 weeks immediately prior to trial and Michael's almost 4 years in foster care, were bases for termination.

### 3. JUVENILE COURT ORDER

Following the termination trial, the juvenile court entered a short order on May 26, 2021, terminating Bernard's parental rights to Michael. In the order, the court without stating any rationale therefor, made the following findings. The court found that the State had met its burden of proving abandonment, substantial and continuous neglect, and that Michael had been in an out-of-home placement for 15 or more months out of the most recent 22 months pursuant to § 43-292(1), (2), and (7). The court also found that pursuant to § 43-292(6), Bernard failed to correct the conditions that led to Michael being adjudicated under § 43-247(3)(a). The court further found that it was in the best interests of Michael to have Bernard's parental rights terminated.

Bernard appeals from the juvenile court's order.

### III. ASSIGNMENTS OF ERROR

Bernard asserts that the juvenile court erred in finding that (1) statutory grounds existed to terminate his parental rights and (2) termination of his parental rights was in Michael's best interests.

### IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate

- 7 -

court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## V. ANALYSIS

In Nebraska, the grounds for terminating parental rights are codified in § 43-292. That statute contains 11 separate subsections, any one of which can serve as a basis for termination when coupled with evidence that termination is in the best interests of the child. *In re Interest of Mateo L. et al., supra*. It is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Mateo L. et al., supra*.

### 1. STATUTORY GROUNDS FOR TERMINATION

We turn to the statutory bases alleged here. In its second motion for termination of parental rights, the State sought to terminate Bernard's parental rights under § 43-292(1), (2), (6), (7), and (9). The juvenile court found clear and convincing evidence to terminate Bernard's parental rights pursuant to § 43-292(1), (2), (6), and (7).

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." By the plain and ordinary meaning of the language in § 43-292(7), there are no exceptions to the condition of 15 out of 22 months out-of-home placement. *In re Interest of Mateo L. et al., supra*. Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al., supra*. In other words, if the 15-out-of-22 formula is met, § 43-292(7) is met. *In re Interest of Mateo L. et al., supra*.

In this case, Michael was placed in agency-based foster care immediately after his birth in April 2017, and he remained with foster parents through at least February 12, 2021, when the termination trial ended. As such, Michael has been in an out-of-home placement for almost 4 years, which equates to his entire life. Such period clearly satisfies the 15-out-of-22 formula.

The State has shown clearly and convincingly that § 43-292(7) exists as a statutory basis for termination of parental rights in this case. And since any one of the bases for termination codified in § 43-292 can serve as the basis for termination, we need not consider the sufficiency of the evidence concerning the other statutory bases for termination. See *In re Interest of Mateo L. et al., supra*. We next consider whether termination is in Michael's best interests.

### 2. BEST INTERESTS

Bernard asserts that the juvenile court erred in finding that he was an unfit parent and that it was in Michael's best interests to terminate his parental rights. In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the children. § 43-292; *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016). Because the parent's right to raise his or her children is constitutionally protected, the court may terminate parental rights only when the State shows that the parent is unfit. *In re Interest of Isabel P. et al., supra*. There is a rebuttable presumption that the best interests of the children are served by having a relationship with their parent. *Id.* This presumption is overcome only when the State has proved

that the parent is unfit. *Id*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id*. The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). While both are separate inquiries, each examines essentially the same underlying facts. *Id*. In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019)*.* In cases where termination of parental rights is based on § 43-292(7), appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is in fact in the child's best interests. *In re Interest of Becka P. et al., supra*.

Bernard argues that the juvenile court determined that termination of his parental rights was warranted based solely on his being incarcerated for 18 months in 2019 and 2020. He also places blame on the Department and on his caseworkers for the lack of progress he made toward reunification throughout the pendency of the case. He believes that he is a good father who is capable of caring for Michael.

Our review of the record conflicts with Bernard's characterization of the evidence presented at trial. First, Bernard's lengthy incarceration during the pendency of the proceedings was not the only evidence presented to support termination of his parental rights. While the State filed the motion to terminate when Bernard was still incarcerated, the State also moved to continue the termination proceedings after Bernard's release in September 2020 in order to give him time to demonstrate his ability and willingness to be a parent. In fact, at the November team meeting, Lackner specifically informed Bernard that he needed to demonstrate complete compliance with his reunification plan in the coming months. Bernard simply failed to do so. Beginning in December, Bernard's participation with his rehabilitation plan tapered off. He stopped submitting to urinalysis testing, he lost his housing, and his attendance at visitations dwindled. He never supplied any proof of employment. In addition, Bernard stopped replying to messages left by Lackner. Perhaps most notably, Bernard failed to even attend the last day of the termination trial in February 2021.

Bernard's lengthy incarceration during the pendency of the juvenile court proceedings is also a factor we must consider in analyzing the juvenile court's decision to terminate his parental rights. When Bernard was arrested after a traffic stop, he was on felony probation and was in the middle of litigating the first motion to terminate his parental rights. Bernard's decision to violate the law at this time placed him in a situation where he was unable to parent Michael in any meaningful capacity for 18 months. It also came at a time when Michael had already been in an out-of-home placement for 2 years. In the juvenile court's order denying the State's first motion to terminate Bernard's parental rights, it is clear that the court wanted Bernard to have more time and opportunity to prove that he could be a capable parent for Michael. Unfortunately, Bernard's decision to violate the law and the consequences of that decision, including having his probation revoked and being incarcerated, impeded his ability to make use of the opportunity given to him by the juvenile court.

In examining all of the evidence presented at the termination trial, we do not ignore the unusual circumstances which occurred at the outset of this case. Despite a DNA test clearly demonstrating Bernard to be Michael's biological father a few months after Michael's birth, Bernard was not permitted to have visits with Michael until he could establish himself as the legal father. We do not understand why the Department placed such a hurdle before Bernard. However, we are also puzzled about why Bernard failed to take the steps necessary to become involved in the juvenile court proceedings and in Michael's life for so long. Our record reveals that as early as June 2017, Bernard was informed and encouraged to establish himself as Michael's legal father by formally establishing his paternity in court. Bernard did not accomplish this task for a period of 16 months. By the time Bernard did establish his paternity of Michael, Michael was a year and a half old and had been in a foster home his whole life. We agree with the juvenile court's findings in its order denying the State's first motion to terminate Bernard's parental rights. The court found that Bernard should be given an opportunity to participate in a reunification plan. However, the court also placed responsibility on Bernard: "It is clear that [Bernard], for 17 months after becoming aware that he was the biological father of [Michael], failed to take measures to involve himself with his son's case."

Unfortunately, Bernard punted his opportunity 18 months down the road by violating the terms of his probation. At the point he emerged from prison, time was of the essence. Bernard needed to become actively involved in performing the requirements of the case plan and in Michael's life. Unfortunately, Bernard did not do so. While he did make some progress, he failed to follow many of the court's orders, failed to communicate with his caseworker, and failed to have consistency in his attendance at visitations. He stopped submitting to testing for alcohol. He moved out of his residence at the request of his adult son and had not reestablished approved housing. He did not appear for the second day of the termination trial. Additionally, Bernard has not attended any doctor appointments with Michael or attended a school related function. Bernard was unaware of who Michael's doctor was or where he went to school. There are still a number of questions surrounding Michael's bond with Bernard. In other words, after nearly 4 years, there remain many goals to be accomplished and little basis to believe that Bernard is willing to make a concerted long term commitment to be a stable and consistent parent with whom Michael can establish a beneficial relationship.

This court has often stated that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. See, e.g., *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015). Michael has been in foster care his whole life, he deserves stability and permanency, which Bernard has been unable to demonstrate that he can provide in the long term. Accordingly, we agree with the juvenile court's determination that there was clear and convincing evidence to show that Bernard is currently an unfit parent for Michael and that his parental rights should be terminated.

## VI. CONCLUSION

We conclude the State proved by clear and convincing evidence that grounds for termination of Bernard's parental rights existed under § 43-292(7) and that termination of his parental rights is in Michael's best interests. Accordingly, the juvenile court's order is affirmed.

AFFIRMED.